HAZEL STANLEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 78518. Filed March 17, 1966.

*Richard W. Wallach,* for the petitioner.
*Leon M. Kerry* and *Arnold Y. Kapiloff,* for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in income tax and additions to the tax against petitioner as follows:

| Year | Income tax | Sec. 293(b), 1939 Code | Sec. 6653(b), 1954 Code | Sec. 294(d)(2), 1939 Code |
|---|---|---|---|---|
| 1952 | $6,267.82 | $3,133.91 | | $395.50 |
| 1953 | 4,942.48 | 2,471.24 | | 300.96 |
| 1954 | 9,236.94 | | $4,618.47 | 552.18 |
| 1955 | 4,097.91 | | 2,048.96 | |
| 1956 | 6,065.72 | | 3,032.86 | |

The parties are agreed that the only issue to be decided is whether petitioner made joint returns with Joseph D. Berke for the years in issue.

FINDINGS OF FACT

Some of the facts were stipulated pursuant to our order to show cause under Rule 31(b)(5), Tax Court Rules of Practice. Such facts are found accordingly.

Hazel Stanley, the petitioner herein, formerly was known as Hazel Berke. During the years in issue she resided in Jamaica, N.Y., with her then husband, Joseph D. Berke (hereinafter referred to as Berke). The returns for the years 1952–56 were in form the joint returns of petitioner and Berke and were filed with the district director of internal revenue, Brooklyn, N.Y. Similar returns were filed for the years 1948–51.

Petitioner and Berke were married in July 1944 after a 2-week courtship. Berke was a dentist, specializing in orthodontia. He also invented a number of devices for use in the practice of orthodontia. The couple had two children, Roger, born in August 1945, and Andrea, born in April 1947.

Petitioner found life with Berke to be less than tranquil. During the years she was married to him she received several beatings at his hands. He frequently criticized her, accused her of various inadequacies, and threatened her.[1] Berke told petitioner that he intended to subjugate her completely to his will.

In 1950 Berke and petitioner moved to a fine house in Jamaica, N.Y. In about 1952 Berke moved his parents into this same house. His mother was suffering from incurable cancer, and his father was partially blind. After her in-laws moved into the house, the mental strain on petitioner greatly increased. She complained of severe migraine headaches[2] and other symptoms. Finally, in the latter part of 1952, petitioner sought help from Kilton Stewart, a qualified psychologist. From petitioner's descriptions of Berke's behavior and from Stewart's own interviews with Berke, Stewart concluded that Berke was a psychopathic personality with violent paranoid tendencies, which at any time could, under stress, turn into paranoia.[3] He feared, and he so informed petitioner, that Berke might at any time, under stress, go berserk and possibly even kill petitioner and the children. Stewart told petitioner that he would continue to treat her only if she agreed

---

[1] Berke threatened, *inter alia*, to kill petitioner, to break her legs, and to have her committed to a mental institution.

[2] According to Wilbur Brett, the physician who treated petitioner for this condition, migraine is a very severe headache, usually involving only one side of the head, and often accompanied by nausea, vomiting, visual disturbances, and/or faintness; the condition is psychosomatic, i.e., caused or aggravated by emotional stress.

[3] Stewart described paranoia as a mental disorder in which the individual's picture of the world becomes stronger to him than reality; such an individual is dangerous to society because he is amoral, and will use any means to force a person or thing to fit his idea of what it should be. According to Stewart, a psychopathic personality with strong paranoid tendencies is a mentally disturbed person who might, under stress, develop complete paranoia and who thus is potentially dangerous.

not to argue with or disobey Berke, or do anything else that might upset or anger him. Stewart hoped that petitioner, by following his advice, might be able to avoid causing Berke's complete and violent breakdown and at the same time be able to recover her own mental health. Petitioner agreed to Stewart's condition. After treating petitioner for about 3 years Stewart finally concluded that it would be advisable for her to leave Berke. Petitioner agreed that this would be desirable, but she was afraid that Berke would pursue and inflict bodily injury upon her and the children. Petitioner did not at this time—around 1955—leave Berke.

Stewart, now confident that petitioner would not suffer a mental breakdown, nevertheless believed that she required further therapy of a kind he could not give. Accordingly he recommended that she go to Alexander Lowen, a licensed psychiatrist. Stewart did not see petitioner very often after 1955. Petitioner first consulted Lowen in October 1956. She described her marital difficulties to him. During the course of treatment she also related her fear of Berke, particularly the fear that he would pursue and kill her if she ever tried to leave him. Lowen concluded that petitioner was justified in fearing her husband. Lowen treated petitioner regularly for about 4 years and occasionally thereafter.

Despite her marital and emotional difficulties, petitioner got along adequately. To friends and neighbors, her marriage did not appear to be particularly abnormal. For the most part she followed Stewart's advice to avoid any clashes with her husband and in this way lived what was in most respects a normal life. Except for occasional complaints about the difficulty of having Berke's parents live with her, petitioner kept her problems largely to herself.

Petitioner's marital problems came to a climax in 1957. In October of that year she removed herself and her children from the family home and moved into her sister's house, which was a few blocks away. Shortly thereafter petitioner instituted an action in the Supreme Court of the State of New York, Queens County, for a legal separation from Berke. On April 1, 1958, the court granted petitioner's motion for temporary alimony, attorney's fees, and custody of the children. Berke did not comply with this order. Petitioner divorced Berke in January 1959 and later that year married Richard Stanley.

Prior to 1952, the first year in issue, Berke had begun accumulating funds, primarily in savings accounts with banks located in various parts of the United States and in U.S. Government Series E bonds. He continued this practice throughout the taxable years and until October 1957. A portion of the savings bonds and a number of the savings accounts were held in the names of Berke and petitioner jointly, despite petitioner's failure to contribute any significant amount to these joint holdings. At Berke's direction, petitioner signed the

signature cards required to open the joint savings accounts, of which there were at least 50. Petitioner endorsed and negotiated a substantial number of checks representing interest paid on the various joint savings accounts. The interest earned on such accounts for each of the years 1952–56 totaled, respectively, $1,917.25, $2,311.39, $2,637.83, $2,908.14, and $3,583.69. Throughout the taxable years, Berke gave petitioner $200 per week for household expenses.

When petitioner first consulted her lawyer about her marital problems in 1956, she was not fully cognizant of the extent to which Berke had been accumulating funds in savings accounts and U.S. Government bonds. At the direction of her attorney, she found the books in which Berke recorded his financial transactions. Petitioner copied the figures in these books and gave them to the lawyer, who was able to derive sufficient information therefrom to form the basis of allegations in the separation action concerning Berke's income and assets.

The income tax returns of petitioner and Berke for the taxable years in issue were prepared by Joseph Jasner, a professional tax adviser, on the basis of information supplied by Berke. Such information consisted, for each year, of an amount of gross receipts and lists of deductible expenditures. The lists of expenditures were compiled by petitioner at Berke's direction. Except for the figure, furnished to petitioner by Berke, representing the amount of gross receipts, the papers prepared by petitioner contained no reference to items of income. The following table shows, for each of the taxable years, the figure furnished to petitioner by Berke as representing his gross receipts and the approximate total of the expenditures appearing on the lists prepared by petitioner:

| Year | Gross receipts | Total expenditures [4] |
|------|-----------|-------------|
| 1952 | $16,175 | $7,031 |
| 1953 | 15,680 | 9,161 |
| 1954 | 18,327 | 12,955 |
| 1955 | 18,512 | 11,825 |
| 1956 | 18,917 | 10,288 |

After Jasner prepared the returns, Berke presented them to petitioner for her signature. Petitioner signed each of the returns. She signed them without question and without examining them. In short, she complied with Berke's directions to sign the tax returns just as she would comply with any other directions he gave her. The returns as filed contained substantial understatements of income. No interest income was reported. Petitioner suspected that not all income was

---

4 For 1952, petitioner's list did not include an item of $1,560 claimed on the return as a salary expense Substantial medical expenditures ($1,284, $2,915, and $2,868, respectively) are included in the totals for 1953, 1954, and 1955. The 1954 total includes some $867 for new office machines. None of the lists prepared by petitioner contained any allowance for depreciation.

The record does not disclose which, if any, of the expenditures listed were paid by petitioner out of the $200 per week allowance given her by Berke. It appears unlikely, from the nature of these expenditures, that any substantial portion was so paid for any of the taxable years.

being reported. She did not, however, comprehend the full significance of this fact; nor did she realize the extent of the understatements.

Respondent commenced his investigation of the tax affairs of petitioner and her husband in January 1958. Petitioner filed her petition herein on January 26, 1959. On March 4, 1959, two of respondent's agents met with petitioner and her attorney at the latter's office. At this conference petitioner answered various questions about the income, assets, and expenses of Berke and herself. As to the returns themselves, she stated that she signed without examining them. Petitioner repeated this assertion in an affidavit executed on April 20, 1959, and submitted to one of respondent's agents. Neither at the conference nor in her affidavit did petitioner claim that she was forced to sign the returns or that she signed them against her will.

Berke left the United States on March 30, 1958, and entered Mexico on a tourist visa. Later that year his immigration status was changed to "resident immigrant," upon his own application. He took with him at least the sum of $111,280.06 in the form of liquid assets.

On November 2, 1961, Berke was indicted by the grand jury, U.S. District Court for the Eastern District of New York, on charges of willfully attempting to evade income taxes for the taxable years 1952–56 and of willfully failing to file an income tax return for the year 1957. On November 16, 1961, Berke failed to appear for arraignment before the District Court; pursuant to court order, a bench warrant was issued for his arrest.

In his statutory notice of deficiency, respondent determined that the returns filed in the names of petitioner and Berke understated taxable income for each of the years 1952 to 1956. The following table compares the taxable income reported on each return with the taxable income determined by respondent:

| Year | Taxable income per return | Unreported income determined | Taxable income per respondent [1] |
|---|---|---|---|
| 1952 | $7,311.25 | $19,285.24 | $26,408.85 |
| 1953 | 6,634.25 | 15,513.86 | 22,821.25 |
| 1954 | 2,830.81 | 26,826.14 | 30,730.00 |
| 1955 | 3,101.58 | 14,659.76 | 18,347.73 |
| 1956 | 6,395.98 | 18,982.71 | 25,378.69 |

[1] After certain relatively minor adjustments to deductible items.

Respondent also determined additions to tax for fraud and underestimation of estimated tax.

Respondent sent copies of the statutory notice of deficiency to Berke in Mexico and to petitioner in New York. Berke had not, as of the time of trial, returned to the United States from Mexico. He did, however, file a petition with this Court for a redetermination of deficiencies and fraud penalties determined against him by respondent

for the years 1952–56 in the notice of deficiency sent to his Mexican address. No appearance was entered by or on behalf of Berke at the time scheduled for the hearing of his case (docket No. 79127) and, pursuant to respondent's motions, we entered an order dismissing that case for lack of prosecution and deciding that there were deficiencies and penalties as determined by respondent.

OPINION

The only issue is whether petitioner made joint returns with Berke for the years 1952–56. If joint, the parties are agreed that petitioner is liable for both the deficiencies and the additions to tax; if not, she is liable for neither. *Furnish* v. *Commissioner*, 262 F. 2d 727 (C.A. 9, 1958), remanding on other grounds 29 T.C. 279 (1957); *Irving S. Federbush*, 34 T.C. 740, 754–58 (1960), affirmed per curiam 325 F. 2d 1 (C.A. 2, 1963). As to whether the returns are joint, the burden of proof is upon petitioner. Cf. *Dora S. Hughes*, 26 T.C. 23 (1956).

Petitioner correctly states that a wife's liability on a joint income tax return depends upon her voluntary execution of the return. See *Furnish* v. *Commissioner*, *supra*. She contends that she is not liable because she was forced by Berke to sign the returns against her will. She further contends that her liability is to be determined by reference to the local, i.e., New York law of duress.

Several cases have considered whether a wife who claimed to have been forced to sign joint returns against her will was liable on the returns. See, e.g., *Furnish* v. *Commissioner*, *supra; Irving S. Federbush*, *supra; Estate of Merlin H. Aylesworth*, 24 T.C. 134 (1955). Although the question has usually been analyzed in terms of "duress," no decided case appears to have considered whether the local law of duress was controlling.[5] Inasmuch as petitioner has raised this issue, we think it appropriate that it be resolved.

Neither the statute nor the regulations use the term "duress." See section 6013, I.R.C. of 1954;[6] section 1.6013, Income Tax Regs. Section 6013(d)(3)[7] imposes joint and several liability "if a joint return is

---

[5] In *Furnish* v. *Commissioner*, 262 F. 2d 727 (C.A. 9, 1958), remanding 29 T.C. 279 (1957), the court cited an 1868 decision of the Supreme Court of the United States and Corpus Juris Secundum, as well as a number of California cases, in its attempt to set forth the law of duress. The court did not expressly consider what law should be applied, nor can the decision be read as implicitly holding that California law applied. In fact, the Court of Appeals remanded the case for redetermination of the question of duress "under the modern law," presumably the rule expressed in the court's quotation from Corpus Juris Secundum. See 262 F. 2d at 733–734.

[6] Unless otherwise stated, all statutory references are to the 1954 Code.

[7] SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.
(d) DEFINITIONS.—For purposes of this section—

\* \* \* \* \* \* \*

(3) if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several.
Almost identical language appears in sec. 51(b)(1) of the 1939 Code.

made." The rule which relieves a wife of this statutory liability on the ground that she was forced to sign the return against her will in effect interprets the term "joint return" used in section 6013(d)·(3) as not including a return so signed. This interpretation of the statute is obviously grounded upon the principle that it is unfair to attach legal consequences to an involuntary act.

At this point it would be well to examine the common law of duress. The following excerpts from the opinion of Justice Heher in *Rubenstein* v. *Rubenstein*, 20 N.J. 359, 120 A. 2d 11 (1956), aptly summarize the modern view of duress as used in the law of contracts [8] (see 120 A. 2d at 13–14):

consent is the very essence of a contract and, if there be compulsion, there is no actual consent. * * * Duress in its more extended sense means that degree of constraint or danger, either actually inflicted or threatened and impending, * * * such as in fact works control of the will. * * *

\*        \*        \*        \*        \*        \*        \*

It would seem basic to the legal concept of duress, proceeding as it does from the unreality of the apparent consent, that the controlling factor be the condition at the [critical] time of the mind of the person subjected to the coercive measures, rather than the means by which the given state of mind was induced, and thus the test is essentially subjective.

In the modern view, moral compulsion or psychological pressure may constitute duress if, thereby, the subject of the pressure is overborne and he is deprived of the exercise of his free will. The question is whether consent was coerced; that is, was the person complaining "induced by the duress or undue influence to give his consent, *and would not have done so otherwise.*" Williston on Contracts (rev. ed.), section 1604. See Restatement, Contracts, section 492. * * * the tendency of the more recent cases, and the rule comporting with reason and principle, is that any "unlawful threats" which do "in fact overcome the will of the person threatened, *and induce him to do an act which he would not otherwise have done,* and which he was not bound to do, constitute duress. The age, sex, capacity, relation of the parties and all the attendant circumstances must be considered. * * *" Williston on Contracts, section 1605. * * * [Emphasis supplied].[9]

Because of the analytical and factual similarities between the concept of duress as used in the law of contracts and the rule of nonliability on involuntarily signed tax returns, it was natural for the problems encountered in applying the latter to be analyzed in terms of the former. However, because of the interposition of section 6013 (d)(3), we may not blindly apply local—in this case New York— rules of duress, as petitioner suggests we do. The inquiry as to whether or not a Federal income tax return is a "joint return," i.e.,

---

[8] The idea that no legal consequences should attach to an involuntary act has also produced, *inter alia,* the defense of duress in criminal law, see 22 C.J.S., Criminal Law sec. 44, the need for a voluntary act to establish tort liability, see Prosser, Torts, secs. 7, 8, pp. 30–31 (3d ed. 1964), and the tort law concept of duress, see Prosser, *supra* at sec. 18, pp. 107–108.

[9] The significance of the italicized portions of this excerpt will presently be made clear.

whether or not it was signed voluntarily, should be conducted under a uniform set of standards. We do not believe that Congress intended the meaning of the term "joint return," as used in section 6013, to vary from State to State according to the peculiarities of local rules about duress.[10] Such local rules tend to involve artificial tests as to whether certain kinds of pressure are insufficient as a matter of law to result in duress, or whether the pressure applied need be so great as to overcome the will of a "reasonable man" or "a person of ordinary firmness." See *Furnish* v. *Commissioner, supra* at 733 (reasonable man); 5 Williston, Contracts, sec. 1605 (person of ordinary firmness). Rules of this nature tend to obfuscate rather than enlighten the essentially factual inquiry into the voluntariness *vel non* of the signature on the return.[11] Nevertheless, if this caveat is kept in mind, resort to the common law of duress can be quite helpful. It is this approach which the decided cases appear to have adopted. The conclusion in a given case that "duress" was or was not present is thus simply a shorthand way of stating that the returns were or were not signed involuntarily.[12]

We turn now to the record in the instant case. Petitioner's presentation was directed chiefly at showing Berke's domineering nature and petitioner's inability to resist his demands. Petitioner's proof of these aspects of the case was adequate. We are satisfied that *if* petitioner had felt any reluctance about signing the returns in question when they were presented to her by Berke, she might nevertheless have signed them out of fear of the consequences of angering her husband. But petitioner was required to prove such reluctance; she had to prove that she would not have signed the returns except for the constraint applied to her will through her fear of Berke. Such a rule is necessary to prevent a party from avoiding the consequences of an act which he would have performed even if he had not been subjected to pressure. Proof that a starving man was ordered at gunpoint to eat a piece of bread would not, standing alone, be satisfactory proof that it had been eaten involuntarily. Not surprisingly, the requirement that there be proof of the involuntary nature of the act has its parallel in the law of duress:

---

[10] Petitioner asserts that the New York law on duress is the same as the modern rule referred to in *Furnish*. However, the cases cited by petitioner fall far short of establishing this assertion; nor were we able to find any such cases. On the other hand, there does not appear to be any New York case rejecting this so-called modern rule. The difficulty in determining the law of a given jurisdiction is another factor indicating the undesirability of strictly applying local law, although it is not of itself entitled to much, if any, weight.

[11] In the absence of artificial rules, a determination that the pressure applied in a given case was not great enough to overcome the signer's will to resist would logically lead to the conclusion that the signature was in fact voluntary.

[12] These cases certainly should not be viewed as establishing a Federal common law of duress.

Not only must fear be produced in order to constitute duress * * * but the fear must be a cause inducing entrance into a transaction, and though not necessarily the sole cause, *it must be one without which the transaction would not have occurred.* [Restatement, Contracts, sec. 492, comment *f* (1932). Emphasis supplied.[13]]

See also the italicized portions of the excerpts from the *Rubenstein* case, quoted *supra* (fn. 9).

We are of the opinion that petitioner has failed to prove the necessary causal relationship between her fear of Berke and her signing of the returns, and we so hold.

It should first be noted that petitioner signed joint returns for the years 1948–51, as well as for the years in issue.[14] Since petitioner first consulted Kilton Stewart near the end of 1952, it is apparent that his advice did not influence her decisions to sign the returns for 1948–51. Thus, we can infer that petitioner would have signed the returns for the taxable years even if Stewart had not advised her to comply with Berke's demands.[15]

It is significant that petitioner did not disclose or even suggest any reason for being unwilling, or even reluctant, to sign the tax returns. As a matter of fact, she did not even state directly that she was unwilling or reluctant to sign them. If petitioner opposed the idea of signing joint returns, one would expect her to have some reason or explanation for her opposition and to make such reason known in a proceeding in which she is making the claim that she signed the returns under duress.[16] This is particularly true when it is recalled that petitioner signed no fewer than nine such returns.[17] We think it is fair, then, to infer that petitioner had no reason for being reluctant to sign the joint returns.

The question of petitioner's state of mind in signing the returns is one of proof, and a reason or explanation for some opposition to

---

[13] This also appears to be the rule in New York. See *Dunham* v. *Griswold,* 100 N.Y. 224, 3 N.E. 76 (1885) ; *Sylvan Mortgage Co.* v. *Stadler,* 115 Misc. 311, 188 N.Y. Supp. 165 (Sup. Ct.), affd. 199 App. Div. 965, 191 N.Y. Supp. 955 (1921), (see 188 N.Y. Supp. at 167).

[14] The first year for which the "split-income" provisions of the 1939 Code were effective was, of course, 1948. Revenue Act of 1948, 62 Stat. 110, secs. 103, 105, 301.

[15] This factor distinguishes the instant case from *Ethel S. Hickey,* T.C. Memo. 1955–149, cited by petitioner. In any event, the Court in *Hickey* does not appear to have considered whether the taxpayer would have signed the return even if her husband's doctor had not advised her to comply with his wishes.

[16] In view of petitioner's failure to prove *any* reluctance to sign the returns, we need not consider whether or not proof of pressure which overcomes an *unreasoned* or *irrational* opposition to signing could as a matter of law be sufficient proof of involuntariness. Compare *Irving S. Federbush,* 34 T.C. at 757–758, where the Court found that the wife's refusal to sign the 1944 return was for reasons not related to the filing of the return, then went on to hold the return to be joint, even though the husband signed the wife's name after she had refused to sign ; she did not intend the return to be different from other joint returns she had signed. See also *Estate of Merlin H. Aylesworth,* 24 T.C. 134, 145–146 (1955).

[17] While the record discloses a definite worsening of relations between petitioner and Berke in 1952, there is no evidence that petitioner's state of mind when signing the returns was different in the period 1952–56 than it was in the period 1948–51.

signing would add support to her bare claim of unwillingness, just as proof of specific incidents at the time of the signing would add such support. Conversely, absence of such proofs detracts from petitioner's claim, because a reason for opposition and incidents at the time of signing would often (though not always) be companions to any real reluctance to sign. It is in this regard that the lack of evidence of unpleasant incidents in connection with petitioner's signing the returns becomes relevant. Cf. *Irving S. Federbush, supra* at 757 (lack of specific incidents when the returns were signed relied upon as one factor indicating no duress). It is not, as respondent seems to argue, that there can be no finding of involuntariness without proof of such incidents. Cf. *Furnish* v. *Commissioner, supra.* Another factor indicating that petitioner did not sign the returns involuntarily is her failure to raise the issue until March 1964, shortly before the trial, rather than in her original petition (filed in January 1959) or at a conference with two of respondent's agents (in March 1959). This delay was not satisfactorily explained; we do not think it was due to oversight.

Petitioner points out that she alleged in her December 13, 1957, reply affidavit filed in her separation action against Berke that the returns "were signed by me under his [Berke's] direct command without any possibility of discussion relative thereto and, as always, I had no alternative but to knuckle under to his orders."[18] However, petitioner did not specifically allege that she signed unwillingly,[19] whereas she did indicate that her state of mind was no different when signing the returns than when complying with any other of Berke's wishes. We do not believe that petitioner's compliance was always or even usually forced. Consequently, we do not believe that this evidence materially aids petitioner; it certainly is not sufficient to carry her burden of proving she signed the returns against her will, particularly in view of the factors discussed above.

It is also relevant that Sidney Cohn, Beatrice Cohn, and Harry Deutsch, all of whom were acquainted with petitioner and Berke over an extended period of time, as well as Jose Ibanez, next door neighbor of petitioner and Berke during the taxable years, testified that they noticed nothing unusual in the relationship between petitioner and Berke. Because of the limited opportunities for these witnesses to observe petitioner and Berke together, their testimony does not alter our evaluation of Berke as set forth in our Findings of Fact. It does, however, illllustrate that the relationship between petitioner and Berke was characterized by a considerable degree of normalcy.

---

[18] Petitioner reaffirmed the truth of this allegation in her testimony herein, but she did not elaborate upon it.

[19] The absence of any explicit assertion, in the reply affidavit, of petitioner's unwillingness to sign the tax returns is to be contrasted with the allegations in petitioner's original affidavit (in the separation action) to the effect that Berke often forced his sexual attentions upon petitioner against her will.

Petitioner points to certain testimony of Kilton Stewart and Alexander Lowen as support for her position. These men, both of whom treated petitioner for mental or emotional problems, stated in response to questions of petitioner's counsel that in their opinions petitioner could not have resisted Berke's directions to sign the returns, even if she had not wanted to sign. The fly in petitioner's ointment, however, is, as we have heretofore indicated, that petitioner has not proven any unwillingness on her part to sign the returns. Therefore, the opinions expressed by Stewart and Lowen, based as they were on an unproven hypothesis, are of no help to petitioner.

Petitioner's proof establishes no more than that she signed the returns under the same state of mind existing when she complied with Berke's other directions. We are not prepared to find, on the record before us, that every act performed by petitioner at Berke's direction during the greater portion of their married life was performed involuntarily. Furthermore, we do not believe (and petitioner does not appear to argue) that petitioner was mentally incompetent during the taxable years.

Petitioner's cause is not advanced by her citation of *Furnish* v. *Commissioner*, *supra*. In that case, the Court of Appeals for the Ninth Circuit believed that the decision of this Court finding no duress in a wife's signing joint returns was influenced by an erroneous view of the law of duress. The Court of Appeals held that under modern doctrine a long continued course of mental intimidation *could* constitute duress, and remanded the case for a redetermination of the question of duress under this modern rule. 262 F. 2d at 731–734.

We are not holding that Berke's treatment of petitioner during the time they were married could not constitute constraint sufficient to cause petitioner to sign the returns against her will. But constraint alone is not enough to constitute duress; there must result from the constraint an act which would not otherwise have been performed. Cf. Restatement, Contracts, sec. 492, comment *f*, *supra*. We have carefully considered petitioner's relationship with and fears of Berke in evaluating the evidence of record; we conclude that petitioner has not proven the returns to have been signed by her involuntarily. This failure of proof is fatal to petitioner's case.[20]

Petitioner on brief depicts herself as the wholly innocent victim of a maniacal husband. Respondent, on the other hand, describes petitioner as "a very willing assistant to tax fraud." Not surprisingly, neither account is in accord with our own interpretation of the record. Petitioner's marriage was certainly an unhappy one. Futhermore, we are satisfied that Berke was primarily responsible for the large understatements of income which have produced the deficiencies and

---

[20] The same result would follow if we mechanically applied the New York law of duress. See fn. 13, *supra*.

penalties involved herein. On the other hand, petitioner admittedly knew for many years that Berke had been depositing funds in banks all over the country. She even suspected that he was not reporting all his income; had she been so inclined, she could have verified this suspicion by comparing her $200 per week household allotment and the sum of the expenditures she compiled on the lists given annually to Jasner, the accountant, with the figure Berke supplied to her as representing his gross receipts. We ascribe her failure to do so not so much to fear of Berke as to a general lack of interest in or complacency with regard to family financial affairs.

We need not find that petitioner acquiesced in Berke's fraud to believe that she could have signed the returns voluntarily. A joint income tax return has the effect, in the vast majority of cases, of reducing the tax which would have to be paid if separate returns were filed. The tax saving normally accrues to the benefit of the entire family unit. Even though petitioner in the instant case did not control the family wealth, she nevertheless benefited by having the additional funds available to help support her and her children at a fairly comfortable standard of living. In this respect, at least, petitioner stands on no different footing than other women who sign joint returns every year at the directions of their husbands, without really knowing the contents of the returns or the nature of the obligation they are undertaking. We have no doubt but that there are millions of such women; it could not seriously be contended that any significant portion of them sign involuntarily.

Except for her unfortunate marriage to a domineering and sometimes violent man, petitioner has not shown herself to be entitled to any special treatment as regards the joint and several liability imposed by the statute on those who make joint returns.[21]

Reviewed by the Court.

*Decision will be entered for the respondent.*

BRUCE, *J.*, concurs in the result.

---

[21] See and compare *Estate of Merlin H. Aylesworth, supra.*