LOLA I. BROWN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3476–65.   Filed October 22, 1968.

Lola I. Brown, pro se.
*James D. Burroughs*, for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in petitioner's income tax and additions to tax as follows:

| Year | Deficiency | Additions to tax | |
|---|---|---|---|
| | | Sec. 6653(b), I.R.C. 1954 | Sec. 6654(a), I.R.C. 1954 |
| 1956 | $2,408.82 | $1,267.41 | $14.09 |
| 1957 | 7,728.37 | 3,864.19 | |
| 1958 | 29,574.55 | 14,787.28 | |
| 1959 | 442.76 | | |

The determinative issue presented is whether petitioner made joint returns with her former husband for the years 1956 through 1959.

FINDINGS OF FACT

Lola I. Brown (herein referred to as petitioner) was a resident of Atlanta, Ga., at the time the petition herein was filed. Federal income tax returns for the years 1956 through 1959 in the names of Lola I. Brown and E. Thurston Brown (petitioner's former husband, who is referred to herein as Thurston) were in the form of joint returns and were filed with the district director of internal revenue at Atlanta, Ga.

Petitioner and Thurston were married in 1940. Two children were born to them, James who was 24 years of age at the time of trial and Lola E. who was then 20 years of age.

Throughout most of the marriage petitioner was unemployed. She worked for 18 months during 1940 and 1941 and has been employed

from 1960 until the present time. Petitioner did not receive any taxable income during the years in issue. In 1954 petitioner began to exhibit horses raised by Thurston in horse shows which offered cash prizes. Although horses owned by Thurston often won prizes, expenses always exceeded income creating losses each year from the enterprise. Petitioner's children enjoyed riding and had their own horses. Although petitioner originally was "petrified" of horses, she agreed to exhibit them as a result of Thurston's threats that if she did not, he would sell the children's horses. In 1957 petitioner sustained from an accident relating to her showing of horses an injury to her back which caused a paralysis in her right side. She underwent spinal surgery that year and was bedridden for a lengthy period of time while she received extensive physical therapy. During this period petitioner suffered great pain which required large doses of narcotics to allay.

Thurston controlled with an iron hand all financial matters throughout his marriage with petitioner. He bought everything, including the groceries, and paid the cooks. Petitioner was never given a personal allowance nor was she allowed to write checks on their joint checking account. Petitioner was not allowed to make decisions on financial matters.

In all other respects Thurston was a domineering husband who displayed little regard for petitioner and her welfare and mental and physical well-being. He had a violent temper and often struck and bruised petitioner. Thurston is a large man whose size greatly exceeds that of petitioner, a frail, petite, and nervous person. He intimidated his children to the point that eventually both ran away from home.

In each year from 1956 through 1959, Thurston received certain "commissions" on transactions arranged by him between agencies of the State of Georgia and independent contractors. None of these receipts were reported on the Federal income tax returns filed by Thurston.

During the years in issue the Federal income tax returns in the names of Thurston and petitioner were prepared by certified public accountants based solely upon information given them by Thurston. He required petitioner to prepare schedules reflecting the losses incurred from the showing of horses owned by him, but she was unaware of other information given by Thurston to the accountants relating to sources and amounts of his income. From the outset in 1954 petitioner disapproved of Thurston's involvement in politics and in selling arrangements with State agencies because of the "bad publicity" surrounding such activities. Through the years in issue here, however, petitioner did not know that Thurston was receiving

"commissions" on the State contracts, but she was aware that he did not always tell her the truth.

After the returns were prepared, Thurston gave them to petitioner solely for the purpose of signing them. In each instance she requested an opportunity to look at the returns and inquired how Thurston knew they were correct. He assured her that "the C.P.A. fixed them" and refused to allow her to read or study them. If petitioner asked any questions about the return, Thurston became enraged and demanded, "you sign it or else." He often hit petitioner, and, as a consequence, she and the children suffered more. Because of Thurston's size and his violent temper, petitioner was on occasion put in fear of her life. Petitioner reluctantly signed the Federal income tax returns for each of the years 1956 through 1959 at the direction of Thurston whose threats and physical abuse rendered her incapable of resisting his demands.

Petitioner and her daughter moved away from Thurston in September 1967, after he was released from a Federal penitentiary, and a divorce was granted to petitioner on March 13, 1968, on the grounds of Thurston's physical violence and abuse.

OPINION

Respondent contends that the evidence presented by petitioner "has done little more than show that her husband was domineering and that they argued on numerous occasions" and, thus, is wholly insufficient to sustain a finding that she signed the returns in question while under duress. He argues that petitioner is jointly and severally liable for any deficiencies in the returns and all additions to the tax.[1]

Petitioner asserts that her own testimony, supported by that of her two children and Thurston, clearly establishes a pattern of domineering and abusive conduct exercised by Thurston in all family affairs and, specifically, such violence and intimidation directed by him toward her on the occasions when she signed the returns sufficient to, and which did in fact, render her act of signing involuntary. She

---

[1] Both Thurston and Lola Brown signed the income tax returns filed for the years 1956 through 1959. A notice of deficiency was sent to both of them on Mar. 23, 1965, and a joint petition was filed with the Court on June 18, 1965. After answering the petition, respondent filed on Feb. 4, 1966, a motion to dismiss the petition as to E. Thurston Brown for lack of jurisdiction on the ground that he had been adjudicated a bankrupt on Mar. 31, 1965, by the U.S. District Court for the Northern District of Georgia, Atlanta Division. See sec. 6871(b), I.R.C. 1954. The motion to dismiss was granted by the Court on Mar. 2, 1966. The income taxes and additions to tax involved herein have been assessed against E. Thurston Brown, a notice of lien filed, and a notice of claim filed in the bankruptcy proceeding. On June 30, 1965, a discharge of the bankrupt was ordered by the referee in bankruptcy. Since Federal tax claims are not debts affected by a discharge in bankruptcy, 11 U.S.C. sec 35, the tax assessments against E. Thurston Brown are still outstanding and collectable from his real or personal property. Thus respondent is not left without recourse against E. Thurston Brown.

argues that the consequence is, in effect, that she filed no return for each of the years 1956 through 1959, and, since she had no income of her own during those years, she has no tax liabilities.

Spouses may file a joint return even though one has neither gross income nor deductions, but as a consequence liability with respect to the tax is joint and several. Sec. 6013(a) and (d)(3), I.R.C. 1954.[2] "Such liability covers not only the basic tax but also any addition to the tax on account of fraud, notwithstanding that the wife may have signed the return in blank and that she was innocent of the fraud." *Furnish* v. *Commissioner*, 262 F.2d 727, 731 (C.A. 9, 1958), remanding in part sub nom. *Emilie F. Funk*, 29 T.C. 279 (1957); *Irving S. Federbush*, 34 T.C. 740 (1960), affirmed per curiam 325 F.2d 1 (C.A. 2, 1963). For purposes of section 6013, however, a joint return form signed by both spouses does not constitute a "joint return" when the signature of either party is executed under duress. See *Hazel Stanley*, 45 T.C. 555 (1966); *Furnish* v. *Commissioner, supra; Paul J. Frederick*, T. C. Memo. 1957-225; *Ethel S. Hickey*, T. C. Memo. 1955-149.

A determination of duress must be made under a uniform standard unaffected by the idiosyncrasies of particular State law. *Hazel Stanley, supra*. The "modern" standard is entirely subjective, i.e., "whether the pressure applied did in fact so far affect the individual concerned as to deprive him of contractual volition." 17 C.J.S., Contracts, sec. 175; 8A Mertens, Law of Federal Income Taxation, sec. 47.09 (1964 rev.); *Furnish* v. *Commissioner, supra*. The standard, as developed, involves two critical elements: (1) Whether the taxpayer was unable to resist demands to sign the return; and (2) whether "she would not have signed the returns except for the constraint applied to her will." *Hazel Stanley, supra* at 562. In other words, petitioner must show not only that she had no choice in executing her signature but also that she was "reluctant" to do so.

In formulating a standard of duress applicable in Federal tax controversies, the Court of Appeals in *Furnish* v. *Commissioner, supra* at 733, stated:

"Duress" may exist not only when a gun is held to one's head while a signature is being subscribed to a document. A long continued course of mental intimidation

---

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

(a) JOINT RETURNS.—A husband and wife may make a single return jointly of income taxes under subtitle A, even though one of the spouses has neither gross income nor deductions, except as provided below:

\* &ast; \* \* &ast; \* \*

(d) DEFINITIONS.—For purposes of this section—

(3) if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several.

can be equally as effective, and perhaps more so, in constituting duress.[6] * * *

Here Mrs. Funk was defrauded by her then husband, who was at the same time defrauding the government. She may have signed as an automaton; there could well have been no exercise of her free will. Under the peculiar circumstances of this case, we believe it harshly inequitable for the wife to be forced to pay a penalty for fraud arising out of nothing she had done, save signing a blank return required of her by a dominating husband who was attempting to defraud both his wife and his government.

[Footnote omitted.]

Petitioner has established without question "a long continued course of mental intimidation" by Thurston. He dominated almost every facet of their married life, particularly with respect to financial matters. This is not to say, however, that petitioner obeyed always without any question or objection. When she asserted her will, Thurston became enraged and gained her submission through the use of force and violence. Thurston's intimidation was both mental and physical and extended not only to petitioner but also to their children, who both eventually left home as a result of his treatment. By his own words Thurston is a "domineering, mean, asinine man."

This general course of conduct was reflected in Thurston's handling of the Federal income tax returns filed by him for the years 1956 through 1959. We have found as a fact that Thurston gave petitioner no choice but to sign the returns. The circumstances surrounding each signing indicate that petitioner did not, however, sign the returns merely as an automaton. She objected to Thruston's involvement in sales transactions with State agencies because of the "bad publicity." Although she did not know that he was receiving "commissions" which he failed to report as income, she was aware that he did not always tell her the truth. Thus, she requested an opportunity to look over the returns before she signed them. Thurston assured her that "the C.P.A. fixed them," but when she persisted he became adamant. He demanded, "you sign it or else," and sometimes hit her. At the time she signed the 1956 return, petitioner was confined to a bed with a partial paralysis resulting from a horse accident. She suffered great pain from the injury, yet Thurston threatened to hit her if she did not sign the return. Petitioner testified that Thurston "would put me in fear of my life if I didn't do what he said, and as long as I did what he said, he didn't threaten me." Petitioner objected to signing each of the returns in issue unless she first had an opportunity to look them over, but every time she capitulated out of a realization that "when I started questioning this, things got worse. I suffered more and the children suffered more."

The element missing in the taxpayer's offer of proof in *Hazel Stanley, supra*, i.e., that she was reluctant to sign the returns, is present in this case. Accordingly, we hold that petitioner's signature to each of

the income tax returns for the years 1956 through 1959 was procured by Thurston through duress and was not the result of her voluntary act. Consequently, the returns filed by Thurston were not joint returns within the purview of section 6013, and petitioner is not severally liable thereon.

In view of our conclusion on this issue, we do not reach several other issues raised by the parties.

*Decision will be entered for the petitioner.*