JEAN D. PIRNIA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pirnia v. Commissioner
Docket No. 11233-88
United States Tax Court
T.C. Memo 1990-444; 1990 Tax Ct. Memo LEXIS 474; 60 T.C.M. (CCH) 554; T.C.M. (RIA) 90444; August 20, 1990, Filed *474 Decision will be entered for the petitioner. Ronald M. Martin, for the petitioner. Jeffry J. Erney, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in, and additions to, the Federal income taxes of petitioner and her former husband, Dr. Abdolvahab S. Pirnia, as follows: Additions to Tax under Sections [1]
Year
Deficiency
6651(a)(1)
6653(a)(1)
6653(a)(2)
6661 1983
$ 61,014.28
$ 13,588.05
$ 3,217.61
*
$ 15,253.57
1984
$ 69,469.00
$ 10,208.10
$ 3,687.00
*
$ 17,367.25
1985
$ 83,036.84
$  3,822.20
$ 4,733.29
*
$ 20,759.21
*475 Dr. Pirnia is not a party to this proceeding. The issues for decision are: (1) whether petitioner filed (or intended to file) joint Federal income tax returns with Dr. Pirnia for the years 1983, 1984, and 1985; and, if so, (2) whether she qualifies for "innocent spouse" relief under section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated by this reference. Our findings of fact are based on petitioner's uncontroverted testimony; we found her to be a credible witness. Dr. Pirnia did not testify. Jean D. Pirnia (petitioner) resided in Dayton, Ohio, when she filed her petition in this case. Petitioner was first married in 1965, and had a son, Bobby, by that marriage. The marriage ended in divorce in 1976. In 1974, petitioner *476 met Dr. Abdolvahab S. Pirnia (Dr. Pirnia), a plastic surgeon who is both an Iranian and an American citizen. They were married in an Islamic ceremony (according to his wishes) in August 1976, followed by a civil ceremony in September 1978. Two children, a son, Abdul Reza, and a daughter, Garin, were born to them in 1976 and 1977, respectively. Despite his previous promises, Dr. Pirnia did not permit Bobby (petitioner's son from her first marriage) to live with them. Petitioner found life with Dr. Pirnia less than peaceful. He considered petitioner and the children as his possessions. He was a domineering husband, who had little regard for the welfare and well-being of petitioner and the children. He forced her to live a secluded life, alienated from her family and friends. He controlled all financial matters with an iron hand. When they married, he took all the assets petitioner possessed, including those she received from the divorce settlement of her first marriage. From that point onward, petitioner and the children were dependent on Dr. Pirnia for their daily living expenses. She was not permitted to have bank accounts, have any knowledge of his finances or business, *477 or make decisions on financial matters. He opened a charge account at a grocery where she had to do all the food shopping. He did not permit her to secure employment; thus, she had no taxable income during the years in issue. Dr. Pirnia had a violent temper; he both physically and emotionally intimidated petitioner. Since she was fearful of the harm he would inflict on both her and their children, she obeyed his wishes. She was completely subjugated to his will. Moreover, Dr. Pirnia's unconventional sexual habits contributed to marital disharmony. Sometime in November 1979, petitioner informed Dr. Pirnia that she and the children were going to leave him. That evening, after dinner, he told her that he was taking "the children to the mall." He did not return with them until nine months later, after having traveled throughout the U.S. (During the nine months, petitioner hired private detectives to search for her children. She was afraid that Dr. Pirnia had made good on his previous threats to take them to Iran permanently.) Fearful that he would "punish" her again for wanting to leave, she stayed with him in order that she could be with the children. In 1986, following *478 a severe beating from her husband, petitioner had him arrested and subsequently filed for divorce. Petitioner and Dr. Pirnia were divorced in 1987. During her marriage, petitioner had no knowledge of Dr. Pirnia's business and financial affairs. Her only participation in the preparation of the tax returns for 1983, 1984, and 1985 was to give him information regarding her show horse activity, which she began in 1981 with his permission. [2] Once she gave him the records, her "duties" in this regard were over. Dr. Pirnia filed Federal income tax returns for 1983, 1984, and 1985 with the Internal Revenue Service Center in Cincinnati. The filing status on these returns was *479 listed as "married filing joint return." Petitioner did not sign the 1983 and 1985 returns, even though her purported signature appears in the signature box. Petitioner did not authorize anyone to sign her name to these returns, nor did she authorize the filing of them as joint returns. Petitioner signed IRS Form 4868 (Application for Automatic Extension of Time to File U.S. Individual Income Tax Return) for 1983. The date next to her signature is July 13, 1985. Dr. Pirnia's accountant, Mark Garlikov, signed the form on April 15, 1984; the record does not reveal when the form was filed with the IRS. The domestic violence and abuse escalated around the time Dr. Pirnia presented petitioner with a tax return for 1984. She signed the return. (Dr. Pirnia only brought her the signature page of the 1984 return and he did not permit her to review the contents of the return.) In 1985, petitioner signed a power of attorney authorizing Dr. Pirnia's attorney, Thomas A. Baldwin, to represent her and Dr. Pirnia in connection with the audit of the alleged joint tax returns for 1981-1984; she also signed an authorization for Mark Garlikov to represent her before the IRS for years 1980-1985. *480 OPINION In general, spouses filing a joint tax return are jointly and severally liable for the tax imposed on the aggregate income required to be reported. Sec. 6013(d)(3). However, a spouse may avoid liability for the tax owed (as well as any additions to tax) by showing that the purported joint return was not in fact a joint tax return. The spouse wishing to disavow the return must show not only that she did not intend to file jointly with the other spouse but if her signature appears on the return that it was either forged or that she signed the return under duress. Brown v. Commissioner, 51 T.C. 116 (1968); Calhoun v. Commissioner, 23 T.C. 4 (1954)
Here, petitioner claims that she did not intend to file jointly with Dr. Pirnia for 1983, 1984, and 1985: that with respect to the 1983 and 1985 returns, her signature was forged, and that with respect to the 1984 return, she signed the return under duress. She disavows the purported joint returns. Respondent claims otherwise. He posits that petitioner's failure to sign the 1983 and 1985 returns does *481 not in and of itself preclude said returns from being joint returns. He argues that petitioner intended the 1983 and 1985 returns to be joint returns even though she did not sign them. In this regard, respondent relies on petitioner's signing IRS Form 4868 to extend the time to file a tax return for 1983, her signing documents authorizing Thomas Baldwin and Mark Garlikov to represent her and Dr. Pirnia for 1980-1985, and her providing Dr. Pirnia with information regarding her show horse activity. With respect to the 1984 return, respondent claims petitioner signed the return voluntarily. Preliminarily, we note that the fact that petitioner signed powers of attorney relating to tax years 1980-1985 is not deemed to be an admission that the returns were intended as joint returns. Helfrich v. Commissioner, 25 T.C. 404, 407 (1955). It is well established that the signature of only one of the spouses does not preclude a return as being treated as a joint return. See Federbush v. Commissioner, 34 T.C. 740, 757 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963); *482 Kann v. Commissioner, 18 T.C. 1032, 1045 (1952), affd. 210 F.2d 247, 251 (3d Cir. 1953); Howell v. Commissioner, 10 T.C. 859, 866 (1948), affd. per curiam 175 F.2d 240 (6th Cir. 1949). The determining factor is whether "the spouses intended to file a joint return, their signatures being but indicative of such intent. * * * This intent may be inferred from the acquiescence of the nonsigning spouse." Hennen v. Commissioner, 35 T.C. 747, 748 (1961); Federbush v. Commissioner, supra; Howell v. Commissioner, supra.Thus, we must examine each year independently to decide whether the 1983, 1984, and 1985 returns are to be recognized as valid joint returns. Petitioner testified that she neither signed nor authorized anyone to sign on her behalf the 1983 and 1985 returns. She further testified that she did not intend the 1983 and 1985 returns to be joint returns. In fact, she claims she was unaware that returns for 1983 and 1985 were even filed. We accept her testimony as truthful. We compared the signature which purports to be hers on the 1983 and 1985 returns *483 with other documents in the record; we also carefully observed her while she testified. We are satisfied (and hence conclude) that the signatures on the 1983 and 1985 returns which purport to be that of petitioner are not hers and that she did not intend to file joint income tax returns with Dr. Pirnia for 1983 and 1985. Petitioner further testified that she signed the 1984 return under duress. No Internal Revenue Code provision specifically addresses or defines duress. We first articulated in Stanley v. Commissioner, 45 T.C. 555, 562 (1966), that where a spouse disavows the signing of a joint return, the spouse must prove both (1) that there was an inability to resist the coercer's demands, and (2) that he or she would not have signed the return except for the constraint applied to his or her will. Thus, "petitioner must show not only that she had no choice in executing her signature but also that she was 'reluctant' to do so." Brown v. Commissioner, 51 T.C. 116, 119 (1968). A wholly subjective standard is used, i.e., "whether the pressure applied *484 did in fact so far affect the individual concerned as to deprive [her] of contractual volition." Furnish v. Commissioner, 262 F.2d 727, 733 (9th Cir. 1958), affg. in part and remanding in part 29 T.C. 279 (1957). "'Duress' may exist not only when a gun is held to one's head while a signature is being subscribed to a document. A long continued course of mental intimidation can be equally as effective, and perhaps more so, in constituting duress." Furnish v. Commissioner, supra at 733. Here, petitioner suffered "a long continued course of mental intimidation" by Dr. Pirnia. He ruled all aspects of petitioner's life. His reign of terror over her was both mental and physical. Forced to obey him, petitioner led an isolated and subjugated life. We believe petitioner signed the 1984 return that Dr. Pirnia presented to her under duress. The first critical element of duress (that the spouse claiming duress must show that she was unable to resist demands from the coercer spouse to sign the return) has been met. Stanley v. Commissioner, 45 T.C. at 562. *485 We further believe that petitioner has met the second element, namely, that she would not have signed the return except for the constraint applied to her will by Dr. Pirnia. The facts herein clearly indicate that petitioner signed the 1984 return only because she was fearful that Dr. Pirnia would carry out his threat to take away their children if she did not sign the return. Because the joint returns for 1983, 1984, and 1985 were not as purported, petitioner is not liable for the determined deficiencies and additions to tax for such years. Consequently, we need not (and do not) decide the second issue, namely, whether petitioner is entitled to innocent spouse relief under section 6013(e). Decision will be entered for the petitioner. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.↩
*. 50 percent of the interest due on the underpayment.↩
2. Losses for 1982 from this activity were disallowed by the Internal Revenue Service. We considered the disallowance in Pirnia v. Commissioner, T.C. Memo. 1989-627↩, wherein we held that petitioner's show horse activity in 1982 was an activity engaged in for profit. The issues now before us were not raised in that case.