PATRICIA F. (KING) GURR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gurr v. Commissioner
Docket No. 1646-74.
United States Tax Court
T.C. Memo 1976-338; 1976 Tax Ct. Memo LEXIS 61; 35 T.C.M. (CCH) 1551; T.C.M. (RIA) 760338; November 10, 1976, Filed Richard C. Cahoon, for the petitioner. Ralph Jones, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent has determined a deficiency of $16,870.48 in petitioner's Federal income tax for the year 1968, plus an addition to tax of $843.52 under section 6653(a). [1]
There being no dispute as to the amount of the deficiency, we are to decide (1) whether petitioner's signature on the joint return she filed with her former husband for 1968 was obtained by duress and (2) whether petitioner is entitled to relief from tax liability under the "innocent spouse" provisions of section 6013(e).
FINDINGS OF FACT
*62 Some facts were stipulated and are so found. Petitioner, Patricia F. (King) Gurr (hereinafter Patricia or petitioner) a resident of Salt Lake City at the time of filing her petition herein, and her then husband, Daniel E. King (hereinafter King) filed their joint Federal income tax return for the year 1968 with the Western Service Center, Ogden, Utah. Patricia had only limited formal education, having dropped out of the ninth grade to marry King in 1959. [2] Shortly after Patricia and King moved to Utah in 1962, King obtained employment as a district manager for a jewelry company. King lost this job, however, due to allegations of theft by his employer and subsequently filed bankruptcy in 1963. In 1966 and 1967, Patricia and King filed joint Federal income tax returns, Form 1040A, reporting income of $2,020.29 and $4,697.45, respectively. In May of 1967, petitioner commenced work for Babcock and Company, a Salt Lake City stock brokerage firm. Later in the same year, petitioner left Babcock and was employed by Lindquist *63 Securities, Inc., another Salt Lake City stock brokerage firm, where she worked until June 1968. While at Lindquist Securities, Inc., petitioner's duties included, but were not limited to, entering trading transactions on ledger cards, answering telephones, writing letters, checking customer accounts, preparing checks, and receiving stock in over-the-counter transactions. In addition to her employment, petitioner derived income from modest trading of inexpensive stocks through accounts at both Lindquist Securities, Inc. and Babcock and Company. Petitioner's total income for the year 1968 was approximately $4,400, consisting of about $1,600 from her employment and about $2,800 from her stock transactions through Lindquist and Babcock. All of Patricia's income from these sources was properly reported on the joint return she and King filed for the year 1968.
During the year in issue, King was employed as an office manager for a Salt Lake City stock transfer agency. In addition to his employment, King derived income in excess of $45,000 from stock transactions similar to those engaged in by Patricia, but on a much larger scale, through accounts he maintained at two other stock *64 brokerages: Parker Company, and its successor, Parker-Mawood Company (hereinafter Parker) and Thornton D. Morris & Company (hereinafter Morris). While King had the proceeds from many of these transactions credited to his accounts at the brokerage firms, he occasionally engaged the services of a third party nominee to effectuate certain stock sales through Morris. On these occasions, the stock was sold by the nominee, who received payment for the sale, deducted his fee, and remitted the balance to King.
On other occasions, King used checks received from the sale of stock to purchase cashier's checks from a local bank, thereafter using the cashier's checks to purchase other property from third parties. King reported the income he derived from his employment, but omitted the income derived from his stock transactions, on the joint return he filed with Patricia for the year 1968. Petitioner and King maintained a joint checking account during the year in issue which recorded the following: Patricia
King
Total [3]
Deposits
$2,842
$13,441
$16,283
Withdrawals
6,030
9,964
15,994
by check
*65 Petitioner's knowledge concerning the joint account, however, was very limited. While she and King kept a single personal check ledger for the month of January 1968 and the prior months of 1967, no such ledger was maintained during the balance of 1968. Although monthly bank statements were sent to the family residence, King did not permit petitioner to open these statements, despite the occurrence of overdrafts on several occasions during the year in issue. In 1967, King purchased the following items: a motorcycle for approximately $600, speculative stocks for $1,000, and a house purchased on an installment contract for $16,250. [4]
The following chart reflects major purchases of consumer items by King during 1968. [5]
Contract Price Item
How Purchased
Downpayment
(Approximate)
1968 Oldsmobile
Installment
$1,394
*
98
Contract
1969 Oldsmobile
Installment
1,153
$4,045
442
Contract
Motorcycle
Cash
Old motorcycle
and $600
Table & Chairs
*
*
Living Room Set
Cash $180
Bedroom Furniture
Cash $300- $400
Color TV/Stereo
Cash
$883.63
Two Womens' Rings
*
*
Stove, Refrigerator
and Miscellaneous
Kitchen Improvements
* $700- $900
*66 Beginning in 1968, petitioner and King experienced severe marital difficulties. King felt that he could not trust petitioner and concealed from her, not only his financial transactions, but often concealed his whereabouts in the evenings as well. The situation deteriorated during the year in issue to the point where it was not uncommon for King to arrive home at 5:00 a.m. and either demand that petitioner not question where he had been or offer petitioner a fictitious explanation for his absence from home. The couple separated permanently in June 1969 and later obtained a divorce in November 1969. Pursuant to a property settlement agreement which was approved *67 by the court and incorporated into the divorce decree, Patricia received custody of the four minor children. King was ordered to pay child support of $50 per month for each of their four children, to place certain stocks in trust for the children, and to pay certain debts of the parties. [6] Although petitioner was not awarded alimony, she did receive the following assets under the terms of the property settlement agreement: Outstanding
[7] Item
Fair Market Value
Liability
Net Value
House
$16,250
$15,445
$ 805
Stocks
4,095
4,095
1969 Oldsmobile
2,400
2,008
392
Home Furnishings
1,000
1,000
A Federal income tax return for 1968 in the names of petitioner and King was prepared by a certified public accountant based on information supplied by King. After the return was prepared, King went to petitioner's residence shortly before midnight on July 15, 1969, solely *68 for the purpose of obtaining her signature on the return. [8] When petitioner asked King if her attorney could examine the return, which reported their gross income as $8,745.25, he assured her that it had been prepared by a certified public accountant and hence, there was no reason for petitioner to question its accuracy. Patricia had never seen a Form 1040 before that evening, but signed the return in reliance upon King's assurances. [9]
During the brief encounter, King made no threats of bodily harm toward Patricia and left the residence immediately upon obtaining her signature on the return. Patricia was very upset when King left as she was hoping that King would remain at the residence to discuss other matters. Respondent, in a statutory notice of deficiency mailed to Patricia and Daniel King on December 6, 1973, determined a deficiency in their Federal income tax for 1968, based upon King's income from stock transactions through Parker and Morris in that year. Patricia alone *69 has petitioned the Court with regard to the deficiency. OPINION We are to decide whether Patricia signed the joint return form which reported her income and that of her former husband, King, under duress and, if not, whether she is entitled to relief from tax liability as an innocent spouse under section 6013(e). For purposes of section 6013, which permits a husband and wife to make a single return jointly, if petitioner signed the return under duress rather than of her own free will, such return does not constitute a "joint return". Lola I. Brown,51 T.C. 116 (1968). To establish that she executed her signature under duress, petitioner must show that she was both unable to resist demands to sign the return, and that she would not have signed the return except for the constraint applied to her will. Lola I. Brown,supra, at 119; Hazel Stanley,45 T.C. 555, 562 (1966). This, she has not done. There is no evidence that King made any threat of violence toward petitioner to obtain her signature on the return. In fact, petitioner's own testimony indicates a lack of fear, in that she hoped King would remain at the residence *70 afterward to discuss other matters and was very upset when he left immediately after she signed the return. We therefore conclude that petitioner has failed to establish that she was unable to resist King's demands to sign the return for fear of bodily harm. See Estate of Merlin H. Aylesworth,24 T.C. 134, 146 (1955). Nor does the evidence support petitioner's claim that King's actions prior to the evening of July 15, 1969, engendered such fear or had otherwise completely destroyed petitioner's free will, rendering her unable to resist such demands.While petitioner testified at length concerning her marital difficulties, she offered no evidence to establish a causal relationship between any alleged mental intimidation by King prior to the evening of July 15, 1969 and the execution of her signature on the return. See Hazel Stanley,supra. Furthermore, we find such claim inconsistent with petitioner's request that her attorney be allowed to first examine the return. See Lola I. Brown,supra; Furnish v. Commissioner,262 F.2d 727 (9th Cir. 1958), remanding in part sub nom. Emilie Furnish Funk,29 T.C. 279 (1957). *71 We therefore conclude that petitioner signed the return in question voluntarily and not under duress. We next consider whether petitioner is entitled to relief from tax liability as an innocent spouse under section 6013(e). For petitioner to be deemed an "innocent spouse" and relieved from liability for the deficiency, she must prove each of the three elements provided for in the statute. [10]Raymond H. Adams,60 T.C. 300 (1973). *72 The first requisite is that of section 6013(e)(1)(A) which requires that petitioner establish that the income omitted from the joint return was "attributable" to her husband. [11]
Having had the benefit of testimony from both King and petitioner on this point, we are satisfied that King owned the stock which produced the income and that petitioner did not knowingly assist King in any manner with his stock transactions through Parker and Morris. Accordingly, we conclude that since the income omitted from the return was attributable to King, petitioner has satisfied the requirements of section 6013(e)(1)(A). Section 6013(e)(1)(B) requires that petitioner establish that "in signing the return, she did not know of, and had no reason to know of" the omitted income. Based upon our evaluation of the credibility of the various witnesses and the manner in which King conducted the stock transactions through Parker and Morris, *73 we are satisfied that petitioner had no actual knowledge of the omitted income. To satisfy her burden of proof with regard to whether she had reason to know of the omitted income, petitioner must establish that a reasonably prudent taxpayer, with her knowledge of the family's finances, would have no reason to know of the omissions. Sanders v. United States,509 F.2d 162 (5th Cir. 1975); Patricia E. Mysse,57 T.C. 680 (1972). Respondent maintains that unusual or lavish purchases by King in 1968 were sufficient to put petitioner on notice of the omitted income. Major purchases by King during the year in issue included a motorcycle, a color television/stereo, inexpensive jewelry, two automobiles purchased on installment contracts, and modestly priced basic furniture such as beds, a table and six chairs, a damaged stove and refrigerator, and a living room set. With respect to the purchases of basic furniture and appliances, these are clearly items of ordinary support, and as such, would not normally give a spouse reason to know of omitted income. Patricia E. Mysse, supra.
While the other items purchased in 1968 required an expenditure *74 of approximately 50 percent of the couple's reported income after Federal income taxes for that year, [12] we find nothing lavish or unusual about such purchases when compared with King's previous buying habits. In 1967, for example, despite their meager income of approximately $4,700 to support a family of six, King purchased a motorcycle for $600, speculative stocks for $1,000 and a house. Furthermore, Patricia was neither consulted nor allowed to participate in the acquisition of most of the items purchased in 1968. In fact, King's method of acquiring most of these items was accomplished in such a manner as to keep Patricia uninformed of the cost, origin, or mode of payment involved. In view of the foregoing and the apparent fact that petitioner knew their income reported for 1968 was substantially more than in 1966 or 1967, we believe it reasonable for her to assume they could likewise afford to purchase more of these items during the year in issue. [13]
*75 Accordingly, we conclude that under these circumstances, such purchases by King during 1968 were insufficient to put a reasonably prudent taxpayer with Patricia's knowledge of the family's finances on notice of the omitted income. See Sanders v. United States,supra.
Additionally, respondent argues that petitioner had reason to know of the omitted income by virtue of her participation in the joint checking account that she and King maintained. We disagree. In 1968, petitioner deposited only $2,842 to the account and wrote checks in the aggregate amount of $6,030. [14] While petitioner knew that King also made deposits to the account and wrote checks against the account during the year in issue, she had no reasonable means of ascertaining the full extent of these transactions. Not only was a check ledger reflecting King's transactions for the months of February through December 1968 unavailable to Patricia, but King did not permit petitioner to open the monthly bank statements sent to the family residence containing such information. While a spouse may not close her eyes to information that is available to her, such spouse is likewise not required to have *76 a perfect knowledge of the family's finances or see that the family maintains a balanced budget to be entitled to the benefits of section 6013(e). Patricia E. Mysse,supra.
Accordingly, we conclude from our examination of the evidence presented on this point, that insufficient facts were available to petitioner through her limited participation in the joint checking account to provide a reasonably prudent taxpayer with reason to know of the omitted income.See Sanders v. United States,supra; cf. Raymond H. Adams,60 T.C. 300, 303 (1973); Compare Jerome J. Sonnenborn,57 T.C. 373, 382 (1971). Finally, section 6013(e)(1)(C) requires a determination of whether petitioner significantly benefited from the omitted income and whether, taking into account all other facts and circumstances, it is inequitable to hold petitioner liable for the tax.A determination under this provision of the statute is subjective and essentially factual. Jennie Allen,61 T.C. 125, 130 (1973), revd. on other grounds 514 F.2d 908 (5th Cir. 1975). *77 Respondent maintains that petitioner's legal right to withdraw funds from the joint checking account and the property she received in the divorce proceedings constitutes a significant benefit to petitioner within the meaning of the statute. In our view, the mere existence of petitioner's joint property right in the bank account involved herein does not constitute a significant benefit. See Dakil v. United States,496 F.2d 431 (10th Cir. 1974). [15] Petitioner actually withdrew only $6,030 from the account during 1968; purchasing securities with approximately $900 and spending the balance on items constituting ordinary support. [16] Clearly, such ordinary support does not constitute a significant benefit within the meaning of the statute. Section 1.6013-5(b), Income Tax Regs.; S. Rept. No. 91-1537, 91st Cong., 2d Sess. (1970), 1971-1 C.B. 606, 607. *78 In the divorce proceeding petitioner received property having a value of less than $7,000 in lieu of alimony after 10 years of marriage. [17] While petitioner received custody of the couple's four minor children and was awarded $50 per month child support for each child, she had to bring action against King to collect the child support which he failed to pay. [18] We therefore conclude that petitioner did not significantly benefit from the unreported income, but even if she had, we believe that taking into account all other facts and circumstances, it would still be inequitable to hold her liable for the deficiency in tax. Dakil v. United States,supra;Sanders v. United States,supra, at 168. Accordingly, we hold that Patricia is entitled to the relief from liability for the deficiency provided in section 6013(e). Decision will be entered for the petitioner.* Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
2. Petitioner later enrolled at a small business college but attended classes for only three months. Patricia was 15 years old when she married King.↩
3. Petitioner made five cash deposits ranging from $200- $450 and deposited eight checks ranging in amount from $18 to $375. With respect to the checks written by petitioner in 1968, approximately $900 of this amount was used to purchase securities through Lindquist. The balance was spent on items such as food, medical and dental care, clothing, house payments, utilities, and so forth. Total deposits to the account by both parties include a portion of the omitted income.↩
4. Apparently, King obtained an educational loan of approximately $2,000 in 1967 which he used to acquire the motorcycle and stocks. The house was acquired with a $450 downpayment.↩
5. While petitioner was not consulted prior to the purchase of many of these items, she was involved in the purchase of the Oldsmobile 98 in January of 1968 to the extent that she was required to co-sign King's promissory note to consummate the purchase. She was not similarly involved with the purchase of the Oldsmobile 442 in December 1968. With respect to the two womens' rings received by petitioner in 1968, she later sold one of these rings for $20.00 and returned the other to King.↩
*. Unclear from the record. ↩
6. King, however, failed to pay child support and certain debts as ordered by the court, requiring a separate suit by petitioner to force King to pay the child support. ↩
7. $16,250 was the cash price of the home in 1967, the record does not indicate its fair market value in November 1969.↩
8. King had obtained an extension of time to file the return until July 15, 1969. ↩
9. Prior to 1968, the couple filed their joint Federal income tax returns on the so-called short form 1040A.↩
10. Sec. 6013(e) provides in part: (e) Spouse Relieved of Liability in Certain Cases. -- (1) In General. Under regulations prescribed by the Secretary or his delegate, if -- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and, (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.↩
11. Respondent concedes that petitioner meets part of the first requirement as there was omitted from gross income on the return an amount properly includable therein, which was in excess of 25 percent of the amount of gross income stated in the return.↩
12. Cash outlays for these items purchased were approximately $4,200.↩
13. In fact, the couple's income increased as follows: ↩ Year
Gross Income
1966
$2,020.29
1967
4,697.45
1968
8,745.25 (Reported)
14. The first deposit made by petitioner was not until July 12 of the year in issue.↩
15. See also Louis C. Miriani,T.C. Memo. 1976-122↩. 16. With regard to the $900 used by Patricia to purchase securities, even if we were to assume that all $900 is attributable to the omitted income and that such securities were either sold by petitioner prior to the divorce or received by her in the divorce proceedings, in view of the relative amounts involved, we are unable to conclude that any resulting benefit to petitioner is "significant".↩
17. Divorce is a relevant factor which may be considered in determining whether petitioner significantly benefited from the omitted income. Sec. 1.6013-5(b), Income Tax Regs.↩
18. King also failed to pay certain of Patricia's debts, as ordered by the court.↩