FRANCES PAPPADIO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pappadio v. Commissioner
Docket No. 12431-80
United States Tax Court
T.C. Memo 1992-568; 1992 Tax Ct. Memo LEXIS 591; 64 T.C.M. (CCH) 892; T.C.M. (RIA) 92568; September 24, 1992, Filed Decision will be entered under Rule 155. Benjamin Lewis, for petitioner. Michael A. Menillo and Wendy Sands, for respondent. BEGHE, Judge. BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent mailed a statutory notice of deficiency to petitioner Frances Pappadio and her husband, Michael Pappadio, increasing the taxable income shown on their joint returns for taxable years 1972-75. Respondent determined deficiencies in and additions to tax as follows: Additions to tax
Years
Deficiencies
sec. 6653(b)
1972
$ 60,385  $ 30,192     1973
100,345  50,172     1974
210,680  105,340     1975
182,351  91,176     Petitioner and Mr. Pappadio filed a timely joint petition in 1980. On May 9, 1990, we ordered Mr. Pappadio's case severed, leaving petitioner as the sole taxpayer-party in this case. On June 6, 1990, we entered decision in favor of respondent in Mr. Pappadio's case, upholding the deficiencies and additions to tax. Respondent has conceded that petitioner is not liable for the additions to tax for fraud under section 6653(b). [1] Petitioner has conceded the amounts of the deficiencies and that *592 their assessment is not barred by the statute of limitations. The only remaining issue is whether petitioner is entitled to relief as an innocent spouse under section 6013(e). FINDINGS OF FACT We find and incorporate the stipulated facts and exhibits. At the time the petition was filed, petitioner resided in Bayside, New York. Introduction
Petitioner was born Frances Ierfino in 1933. She attended Mabel D. Bacon Trade School during 1947-50. She also attended the Drake Business School, where she took courses in basic clerical and bookkeeping skills and earned a certificate of completion. She attended Drake for 2 years during 1975-78, but the record does not show when. In 1955, petitioner married Joseph Fannelli, a garment cutter. Petitioner and Fannelli had four children: Patricia (born June 14, 1956), Michael (March 7, 1958), *593 Michelle (February 9, 1963), and Josie (April 10, 1964). Petitioner and Fannelli were divorced in 1969. While petitioner was single, she filed timely income tax returns. In 1972, petitioner married Mr. Pappadio, who was ostensibly a salesman for a clothing manufacturer. In 1974, Mr. Pappadio adopted petitioner's four children. During 1972-75, Mr. Pappadio held ownership interests in at least 12 garment industry business entities (the Pappadio companies). [2]
On Saturday, May 13, 1989 -- Mr. Pappadio's 67th birthday and Mother's Day were the following day -- petitioner drove Mr. Pappadio to a diner; he asked her to pick him up at a certain house at noon that day. Mr. Pappadio has not been seen or heard from since. The Bayside *594 Gables House
During 1972, Mr. Pappadio arranged for the construction of the couple's house in a private community in Bayside, Queens, known as Bayside Gables. The house is a four-bedroom, four-bath, brick-and-stone Colonial. The master bedroom suite consists of a bedroom, a sitting room, a bathroom, and walk-in closets. Petitioner asked that certain features be incorporated into the house that substantially increased its cost. She wanted the exterior of the second level of the house done in fieldstone, although, because the second story projected from the first floor facade by 2 feet, ordinarily the exterior of the upper level would have been done in wood. The builder had to use steel reinforcements to support the weight of the stone, a technique he has not used on any other house, before or since. Petitioner also wanted a deck off the master bedroom, which was on the second floor. Petitioner asked that the deck not use columns for direct support from the ground below, so the builder cantilevered it. Because she asked for the deck after the house had already been partially built, the builder had to break down part of the house to insert the beams to support the deck. At *595 least part of the cost of the house was paid with checks drawn on bank accounts of the Pappadio companies. In 1975, no fewer than seven checks totaling $ 121,800 were drawn on the bank accounts of two Pappadio companies, payable to the order of the builder. The Pappadios did not report these amounts as income. Initially, the Pappadios jointly owned the house. Before 1982, Mr. Pappadio gave his interest in the house to petitioner for no consideration. In 1982, petitioner gave the house to her four children, also without consideration. She continues to live in the house rent free. Material Enjoyment by Petitioner and Her Children
During 1972-75, the Pappadios' joint returns reported adjusted gross income as follows: Year
Adj. Gross Income
1972
$ 183,887
1973
208,111
1974
135,665
1975
156,108
The Pappadios appear to have lived well within these means. [3] During the years in issue, petitioner decorated her new home with new furnishings. In 1973, the family took two vacations: to Orlando, Florida, for a week including the Fourth of July, and to San Francisco for Thanksgiving. In 1975, two of petitioner's then-teen-aged children, Michael and Patricia, vacationed *596 at Condessa Del Mar, Mexico. The family took no other pleasure trips during the years in issue. The family did not go out for meals with unusually high frequency, and mainly kept to themselves. The family did not have live-in domestic help, but had a day cleaner come in occasionally. The family belonged to a swim club. The children went to Catholic schools; Michael's tuition was the highest at $ 785 for the 1974 school year. Mr. Pappadio bought Michael a used 1971 or 1972 two-door Mercedes Benz automobile for his 17th birthday in 1975. During 1972-75, in addition to the income the Pappadios reported on their joint returns, the Pappadio companies paid for furs, jewelry, clothing, furniture, *597 and other family personal effects. [4] Sidan Converting, a company not identified in the record as a Pappadio company, paid for Michael's tuition in 1974. Mr. Pappadio handled all the household finances. When family members needed money, he gave it to them. Petitioner never received more than $ 300 from Mr. Pappadio at a time. Mr. Pappadio deposited thousands of dollars in bank accounts set up in the name of petitioner or in her maiden name. Petitioner now owns these accounts. In addition to the Bayside Gables house, petitioner maintains as a residence an apartment on East 37th Street in Manhattan. Petitioner also has *598 the use of an apartment in Ft. Lauderdale, Florida, owned by the Pappadio family. Mr. Pappadio's House Rules
Mr. Pappadio was a domineering personality whose word was not questioned in the household. When he asked petitioner or the children to do something, they did it. Mr. Pappadio also refused to tell anyone, even his own family, what his job was. If anyone asked Mr. Pappadio how he made a living, he would say he worked in the garment business. Mr. Pappadio frequently asked family members to sign documents without reading them. Mr. Pappadio would cover all but the signature lines of the document with a blank piece of paper or otherwise conceal the substance of the document so that the signer did not know what he or she was signing. Among the documents petitioner signed or endorsed this way were: the joint returns in issue, the Pappadios' 1976 joint return, and petitioner's separate returns for 1977-88; checks payable to petitioner's order issued by the Pappadio companies; a partnership agreement; a mortgage; a power of attorney; bank account signature cards; and agreements to purchase and sell real estate. The children also signed their own tax returns and other documents *599 for Mr. Pappadio in this fashion. These transactions nominally made petitioner a partner in a real estate partnership (FFMM) and a garment industry trucking firm (Ideal Trucking Co.), a mortgagee, and the attorney-in-fact for a real estate partnership (PMMJ) consisting of her four children. Petitioner had no actual knowledge of the contents of any of these documents at the time she signed them. Petitioner did not help prepare the tax returns for 1972-88, although she did deliver an envelope of substantiating documents to the Pappadios' accountant and knew when she signed the returns that they were tax returns. When tax documents, such as Forms W-2 or 1099, came in the mail to the Pappadios' house, petitioner opened them if they were addressed to her. If they were addressed to Mr. Pappadio, she left them unopened. It is unclear whether all of petitioner's Forms W-2 attached to the Pappadios' joint returns, which reflected substantial wages petitioner did not earn, were mailed to the house. Petitioner's joint returns with Mr. Pappadio for each of the taxable years in issue substantially understated their income tax liabilities because of grossly erroneous items attributable to *600 Mr. Pappadio. In 1979, Mr. Pappadio pleaded guilty in United States District Court for the Southern District of New York to tax evasion for the taxable years 1974 and 1975. Mr. Pappadio had been accused of failing to report dividends received from the Pappadio companies and using the Pappadio companies to pay for family and personal expenses. During the pretrial and other preparations for that case, Mr. Pappadio did not tell his family any details of the case, and made them leave the house when his attorneys were there. Petitioner's Income and Work History
The joint returns for the years in issue claim that petitioner's wages were as follows: Year
Wages
1972
$ 32,450
1973
22,500
1974
8,500
[1] 1975
-?-
Total
$ 63,450
Petitioner did not work outside *601 the home during the years in issue. In addition, petitioner's returns for subsequent years reported the following income attributable to petitioner: Year
Wages
Interest
Other
Total
1976
$    45,737
$  24,736
$         0 $    70,473
1977
26,200
25,911
0 52,111
1978
14,000
33,570
66,433 114,003
1979
0
40,713
216,821 257,534
1980
0
32,413
223,234 255,647
1981
0
20,168
187,807 207,975
1982
0
19,904
229,886 249,790
1983
68,593
2,802
248,811 320,206
1984
232,000
13,711
11,299 257,010
1985
444,112
25,705
(31,214)
438,603
1986
361,016
23,636
133,578 518,230
1987
414,401
41,955
(55,246)
401,110
1988
90,566
52,785
64,783 208,134
1989
54,340
76,486
(24,600)
106,226
1990
12,610
43,054
35,820 91,484
Total
$ 1,763,575
$ 477,549
$ 1,307,412 $ 3,548,536
Petitioner's separate tax returns for 1989 and 1990, prepared after Mr. Pappadio disappeared, show interest income of $ 76,486 and $ 43,054, respectively. The record does not show where the principal that generated that interest came from, nor does it show the source of the principal for the interest reported on petitioner's returns for *602 1977-88. Petitioner became a partner in Ideal Trucking in 1978 when she unwittingly signed a partnership agreement. The agreement shows that Mr. Pappadio transferred to petitioner a 15-percent interest in the partnership for $ 52,500, payable in installments. There is no evidence that petitioner ever made any of the installment payments. Petitioner also worked as an office clerk at Ideal during 1979-85. Her separate returns reported the following income from Ideal over that period, almost all of which the returns describe as self-employment income (referred to as "other" income in the preceding table): Year
Ideal Income
1979
$   200,316
1980
206,318
1981
175,322
1982
211,519
1983
231,097
1984
1,699
1985
2,050
Total
$ 1,028,321
Petitioner's 1983-86 returns include Forms 6252, reporting an installment sale of a "customer list" to Ideal. The list, which the returns say she acquired for $ 34,125 and had an adjusted basis of $ 15,354, sold for $ 540,000. Petitioner's returns indicate that Ideal paid the entire sales price in installments during 1984-86. Gain on the installment sale was netted against $ 601,500 of nonbusiness bad debts during 1984-86 *603 and combined with income for other sources to yield the other income shown in the table supra p. 9. Of the bad debts, two Pappadio companies accounted for $ 377,500 and a relative, Dominic Pappadio, accounted for another $ 100,000. Petitioner also reported $ 186 of miscellaneous income from Ideal during 1986. Apparently in 1983, Woven Express Inc. acquired the business of Ideal Trucking. Petitioner became a shareholder of Woven Express, an S corporation. Petitioner's 1983-87 returns showed the following interest and wages (included in the table supra p. 9) from Woven Express, although petitioner did not work there: Income from Woven Express
Year
Interest
Wages
1983
$      0
$  16,000
1984
8,017
136,000
1985
19,165
279,600
1986
21,570
211,200
1987
0
208,000
Total
$ 48,752
850,800
Petitioner's returns also reported miscellaneous income from Woven Express during 1987-89 in the following amounts (included as "other income" in the table supra p. 9): Year
Woven Misc. Income
1987
$  16,000
1988
154,000
1989
81,000
Total
$ 251,000
In addition, petitioner claimed to be a "material participant" in Woven Express, and reported *604 pro rata shares of income and loss from the company as follows in 1988-90 (included as "other income" in the table supra p. 9): Year
Woven Income/(Loss)
1988
$ (29,148)
1989
(64,810)
1990
7,282 Total
$ (86,676)
During 1984-88, petitioner did work as an office clerk for National Retail Systems, a garment industry trucking firm affiliated with Walsh Trucking Co. and ostensibly unconnected to the Pappadio companies. Petitioner's returns reported the following wages (included in the table supra p. 9) from National Retail Systems, "National Retail Trans. Inc.", and Walsh Super Service Inc.: Year
National/Walsh Income
1984
$  26,000
1985
52,000
1986
13,000
1987
29,583
1988
10,000
Total
$ 130,583
OPINION When a married couple files a joint Federal income tax return, both spouses are liable for the total tax due, jointly and severally. Sec. 6013(d)(3). This means that either spouse may be required to pay all the tax shown due on the return, and any deficiency, plus interest, that may eventually be determined. In certain cases, one spouse may qualify as an "innocent spouse" and be released from liability. Sec. 6013(e). The spouse *605 seeking relief has the burden of proof, Bokum v. Commissioner, 94 T.C. 126, 138 (1990), and must prove for each year that each of the following criteria have been satisfied: (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement * * * [Sec. 6013(e)(1).] [5]
*606 The parties agree that the Pappadios filed a joint return for each of the taxable years in issue, and that those returns substantially understated the Pappadios' income taxes because of grossly erroneous items attributable to Mr. Pappadio. With requirements (A) and (B) satisfied, resolution of this case depends upon petitioner's knowledge and the weight of the equities. A spouse has "reason to know" there is a substantial understatement if, at the time the return was signed, a reasonably prudent taxpayer in the spouse's position could be expected to know that the return contained a substantial understatement. Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979). We consider factors such as the spouse's level of education, the spouse's involvement in the family's business and financial affairs, any marked, unexplained increase in the family's standard of living, and the culpable spouse's evasiveness and deceit about the couple's finances. Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989), revg. an Oral Opinion of this Court dated December 16, 1987. The first three factors all cut in petitioner's favor. Although *607 she had a high school education and perhaps a little bookkeeping training, she was no financial sophisticate at the time she signed the returns for the years in issue. During the years at issue, she had no independent income and was completely shut out of her husband's business and financial affairs. Mr. Pappadio handled all the family billpaying, and the family seemed to be living within its means as reported on the returns in issue. However, Mr. Pappadio's studied evasiveness gave petitioner reason to know of the understatements. Mr. Pappadio was a domineering man. He required that petitioner and her children sign documents they knew nothing about. He made sure, by covering up all but the signature lines or by other means, that his family did not know the contents of the documents they signed. Any questions the family asked about the documents, or about Mr. Pappadio's job, were met with incomplete or vague answers. To say the least, petitioner should have been suspicious. She had filed tax returns before she was married to Mr. Pappadio, and should have been aware that returns are required to be truthful. She received in the mail and opened Forms W-2 issued to her during *608 a period when she did not work outside the home; she should have known that she should not have received Forms W-2 under those circumstances. The merest glance at the returns before signing them would have told petitioner that her husband was claiming that she had substantial amounts of income. In later years, petitioner's separate returns, prepared at Mr. Pappadio's direction, would have told her that he was claiming that she was an owner or participant in a number of business enterprises. Petitioner turned her back on the obvious, signing what amounted to blank checks for 17 years, including the 4 years in issue. Other than that Mr. Pappadio was falsifying their joint returns and creating a web of deception for which he was trying to give his family plausible deniability, there is no reasonable explanation for his requiring her to sign the documents with blinders on. A spouse cannot close her eyes to facts that might give her reason to know of unreported income. Terzian v. Commissioner, supra at 1171; Jerkins v. Commissioner, T.C. Memo. 1991-571. Petitioner believed she was obliged to follow her husband's wishes, *609 but in so doing, she incurred the further obligation to pay the taxes due on the joint returns. Innocent spouse protection does not extend to those who, faced with a recalcitrant spouse, refuse to investigate further. See Adams v. Commissioner, 60 T.C. 300, 303 (1973). We therefore find that petitioner had reason to know that there was a substantial understatement of tax on the joint returns for the years in issue. [6]
For the sake of completeness, we also address the equities. See Jerkins v. Commissioner, supra.Petitioner has the burden of showing that it would be inequitable *610 under all the circumstances to hold her liable for the deficiencies. "[A] factor to be considered is whether the person seeking relief significantly benefitted, directly or indirectly, from the items omitted from gross income." Sec. 1.6013-5(b), Income Tax Regs.
We acknowledge that Mr. Pappadio's disappearance put petitioner at a substantial disadvantage in proving this element of her case, but it is the nature of the burden of proof that the party who bears the burden also bears the risk that a material witness will become unavailable. The passage of time has also worked against petitioner; the more time that passes between the taxable years in issue and the date of the trial, the more evidence of benefit the putative innocent spouse is likely to have to rebut. That said, we find that petitioner has failed to meet her burden of proof. The Pappadios, it is true, did not lead an extravagant lifestyle. If the only income they received was that reported on their returns, they would have been living well within their means. However, the Pappadios did live in a large, well-appointed house paid for primarily with unreported funds from the Pappadio companies. The Pappadios seem to *611 have acquired both the lot and the house free and clear. Mr. Pappadio gave his interest in the house to petitioner -- a transfer of which she appears to have been fully cognizant, unlike most of the other transactions to which she ostensibly was a party. She subsequently gave her children title to the property, but she continues to live there rent free. The distributions from the Pappadio companies that paid for the house appear to account for a substantial portion of the unreported income determined by respondent. Petitioner has benefited and continues to benefit from these funds by living in the house. Petitioner also has the use of apartments in Manhattan and Ft. Lauderdale that appear to be family owned. Petitioner introduced no evidence that these properties were acquired with money other than unreported income and unpaid taxes. Petitioner asserts that a transfer of the family residence to the spouse seeking section 6013(e) protection does not tip the equities against that spouse. Petitioner relies on Cohen v. Commissioner, T.C. Memo. 1991-413, and Ianniello v. Commissioner, T.C. Memo. 1991-415. That reliance *612 is misplaced. In those cases, the property transferred to the innocent spouse was acquired by the other spouse before the taxable years in issue. In this case, the Pappadios acquired the Bayside Gables house during the taxable years in issue, and with the very income that went unreported and led to the deficiencies. Petitioner did not establish that the interest income she reported on her separate returns for the 1977-90 tax years was not the fruit of the unreported income in 1972-75. [7] See Estate of Krock v. Commissioner, 93 T.C. 672 (1989). Because Mr. Pappadio controlled the preparation of petitioner's 1977-88 returns, we are uncertain that she actually benefited from the items reported on those returns; therefore, petitioner has not carried her burden of proof. The returns petitioner prepared and filed on her own in 1989 and 1990 tend to show that petitioner has claimed her place as a partner in or owner of the various entities and properties her husband placed in her name. In 1989, she reported $ 81,000 in "miscellaneous" income from Woven Express, which she was able to shelter with a nonpassive loss of $ 64,810 because she claimed to be *613 a "material participant" and shareholder in Woven Express. [8] Petitioner's interest in Woven Express is directly traceable to her interest in Ideal Trucking, which originated with Mr. Pappadio. Petitioner has not shown that Mr. Pappadio did not use the unreported income in 1972-75 to acquire his interest in Ideal. Finally, *614 we note that the statute requires us to consider all the facts and circumstances in deciding whether it would be inequitable to hold petitioner liable. "Other factors which may also be taken into account, if the situation warrants, include the fact that the person seeking relief has been deserted by his spouse or the fact that he has been divorced or separated from such spouse." Sec. 1.6013-5(b), Income Tax Regs. The factors listed are not exclusive. We may consider any evidence bearing on the equities. While Mr. Pappadio's disappearance is an equitable factor in petitioner's favor, its significance as such is outweighed by the fact that petitioner appears to have acquired beneficial ownership and control of the assets he put in her name while he was still on the scene. Petitioner also appears to have received salaries in later years that were disproportionately large in relation to her stated job duties as a clerk and bookkeeper; the inference we draw is that Mr. Pappadio had arranged these jobs for her. Although these benefits are not directly connected to the taxable years in issue, they are further evidence that petitioner reaped what Mr. Pappadio sowed, and therefore weigh *615 against her in the equitable equation. Another factor that cuts against petitioner is the benefits bestowed on her children by Mr. Pappadio during the years in issue. Petitioner benefited indirectly from these benefits because Mr. Pappadio's undertaking to satisfy the children's material needs relieved petitioner of the burden of taking care of those needs. Inasmuch as petitioner has not proved that she did not benefit from the unreported income, it would not be inequitable to hold her liable for the taxes thereon. Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987); sec. 1.6013-5(b), Income Tax Regs.
Petitioner does not qualify for relief under section 6013(e). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Those entities were: Paddy Pat Inc., Candy Joe Ltd., Reed Fashion Apparel Inc., Marjo Manufacturing Inc., Mary Lou Manufacturing Co. Inc., Springfield Sportswear Inc., Fashion Page Ltd., Miss Normee Ltd., Liz Roberts Inc., Mi-Mari Ltd., Chris Sales Co. Inc., and Confetti Girl Inc.↩
3. In terms of 1990 purchasing power, the Pappadios reported adjusted gross income equivalent to approximately $ 560,000 in 1972, $ 597,000 in 1973, $ 351,000 in 1974, and $ 375,000 in 1975. See Statistical Abstract of the United States 486 (100th ed. 1979), 479 (111th ed. 1991) (Consumer Price Index for New York City area).↩
4. Among the vendors of goods and services the Pappadio companies paid on behalf of the Pappadios are: Bender Briendel, Mendelsohn Bros., Lemon Drop Shop, Bloomingdales, New York Telephone, Lord and Taylor, Health Welfare, Manhattan Theatre Tickets, Master Charge, Kallens, Sciara & Guarneri, People, Terrace Bootery, Sun Oil, Exxon, Meyer Bros., Bay Landscaping, Saks Fifth Avenue, R. Mast, and A&S.↩
1. The 1975 return was a joint return. The copy of the return in the record does not include Forms W-2. Thus, it is impossible to tell how much of the $ 124,775 of wages reported on the return was ostensibly attributable to petitioner.↩
5. We apply the statute as amended in 1984, even though the years before us are 1972-75, because those amendments are retroactively applicable to all open years to which the Internal Revenue Code of 1954 applies. Tax Reform Act of 1984 (division A of the Deficit Reduction Act of 1984), Pub. L. 98-369, sec. 424(a), 98 Stat. 494, 801-801; Bokum v. Commissioner, 94 T.C. 126, 138 n.13 (1990). Sec. 6013(e)(1)(C) is essentially similar to the prior law's sec. 6013(e)(1)(B). Bokum v. Commissioner, supra↩.
6. Petitioner has not raised the issue of whether she had been forced to sign the returns under duress, rendering them invalid as to her. See, e.g., Brown v. Commissioner, 51 T.C. 116 (1968). Duress is an "avoidance or affirmative defense", which must be pleaded specifically. Rule 39↩. In failing to plead duress, petitioner has waived the issue.
7. Petitioer objected to the introduction of her income tax returns for 1976-90 for the purpose of showing that she had benefited from the unreported income. It is well settled that if a spouse benefits from unreported income in a year subsequent to the ones in issue, that benefit is sufficient to deny innocent spouse protection. See Terzian v. Commissioner, 72 T.C. 1164, 1172 (1979); sec. 1.6013-5(b), Income Tax Regs.↩ The tax returns were relevant to determining whether petitioner received any such benfit. Petitioner's objection is overruled.
8. We express no opinion about whether petitioner was entitled to claim material participant status on her 1989 return.↩