DAVID L. WIKSELL AND MARGARET WIKSELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wiksell v. Commissioner
Docket No. 11752-91
United States Tax Court
T.C. Memo 1994-99; 1994 Tax Ct. Memo LEXIS 100; 67 T.C.M. (CCH) 2360; T.C.M. (RIA) 94099; March 9, 1994, Filed *100 An appropriate Order of Dismissal and Decision will be entered as to petitioner David L. Wiksell. Decision will be entered under Rule 155 as to petitioner Margaret Wiksell. 1. R asserted increased deficiencies for 1984 and 1985 and fraud on the part of D in the filing of the returns for those years. The allegations of fraud were well pleaded. In the face of repeated notices, D failed to participate in the preparation for trial, nor did he appear in person or by counsel at trial. Held: R's increased deficiencies and additions to tax for fraud sustained as to D. 2. M, D's spouse, claimed the innocent spouse protection of sec. 6013(e), I.R.C., and also claimed that no valid joint tax returns were filed because 1984 and 1985 returns were signed by her under duress. Held: (1) M has not established that in signing the returns she neither knew nor had reason to know that the returns contained substantial understatements of tax; and (2) the diagnosis of abused spouse by M's clinical psychologist is insufficient to prove that (1) M signed the 1984 and 1985 returns under duress, since petitioners have failed to establish a nexus between spousal abuse generally and duress in the *101 specific circumstances under which the returns were signed. It has not been shown that M was unable to resist her abusive spouse's demands that she sign the returns; and (2) that she would not have signed the returns except to the constraints applied to her will. Brown v. Commissioner, 51 T.C. 116 (1968); Stanley v. Commissioner, 45 T.C. 555 (1966), applied. David L. Wiksell, pro se. For Margaret Wiksell, petitioner: Bruce I. Hochman. For respondent: Glorianne Gooding-Jones. NIMS
NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Additions to Tax
Year
Income Tax
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661
1984
$ 153,739
$   7,687 *
$   38,435
1985
692,750
34,638 *
173,188
* 50 percent of the interest computed on the income tax deficiency at the time of assessment or payment of the tax.
By Amended Answer, respondent asserted deficiencies and additions to tax as follows: Additions to Tax
Year
Income Tax
Sec. 6653(b)(1) Sec. 6653(b)(2)
Sec. 6661
1984
$ 221,294
$ 110,647 * $   55,324
1985
789,919
394,960 **
197,480
Alternative Additions to Tax
Year
Sec. 6653(a)(1) Sec. 6653(a)(2)
1984
$  11,065 *** 1985
39,496 ****
* 50 percent of the interest on $ 221,294.
** 50 percent of the interest on $ 789,919.
*** 50 percent of the interest on $ 221,294.
**** 50 percent of the interest on $ 789,919.
*102 Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Respondent has conceded all additions to tax as to petitioner Margaret Wiksell (Margaret). Margaret has conceded the income tax deficiencies asserted by respondent in the Amended Answer. The issues remaining for decision are: (1) Whether respondent's Motion to Dismiss for Lack of Prosecution as to David L. Wiksell (David) should be granted. (2) Whether Margaret is an innocent spouse as defined in section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated by Margaret and respondent and are so found. Petitioners resided in Newhall, California, when they filed their petition. Petitioners were married in 1960, legally separated in 1988 and divorced in December, 1992. With the exception of the times David was imprisoned, petitioners continuously resided together from the inception of their marriage to the date of the trial of their case. Petitioners had three children. Margaret completed five years of college, graduating as a registered nurse in 1979. She *103 worked part-time as a registered nurse during 1984 and 1985. During the course of petitioners' marriage, David was at various times employed as a stockbroker. Also at various times he began a company called Espuma dealing with polyurethane, began a real estate and/or investment company called Wiksell Ginzmer, sold encyclopedias, was a real estate salesman, repossessed water softeners, was a real estate investment adviser, and was an officer and vice president for investments of Comstock Financial Services, Inc. (Comstock Financial). In 1962 he was convicted of perjury. In 1973 he was charged with the criminal offense of writing bad checks. In 1980 he pleaded guilty and was imprisoned for selling unregistered securities in the Bubble-Up soft drink company. On January 13, 1988, he pleaded guilty to various criminal counts of fraud involving the sale of unregistered securities related to his participation in a fraudulent investment scheme involving Comstock Financial. During 1984 and 1985, Margaret simultaneously maintained checking accounts at Security Pacific National Bank and Santa Clarita Bank. David had no signature authority over these accounts. With the exception of *104 the times David was imprisoned, either he or Margaret retrieved the family mail from the mail box, but generally only the respective addressee opened the envelopes. During the years in issue Margaret paid all household expenses. David maintained a business checking account under the name of Hitech Recovery System, Inc. (Hitech), and periodically gave Margaret money to put into her separate checking accounts. In each instance, David issued a Hitech check made payable to "Margaret Wiksell", which she then deposited into one of the checking accounts she maintained at Security Pacific National Bank and Santa Clarita Bank. Petitioners' 1984 and 1985 Federal income tax returns were prepared by professional accountants. Their 1984 return was signed by Margaret and David on June 16, 1987, and filed on June 22, 1987. Their 1985 return was signed by Margaret and David on November 9, 1987, and filed on November 12, 1987. The record contains no explanation for the late filings, nor facts surrounding the preparation of the returns by the accountants. No extension of time to file either the 1984 or 1985 return was secured. Petitioners' 1984 Federal income tax return was filed with the Internal *105 Revenue Service while David was in county jail. The record does not disclose the circumstances under which the 1985 return was signed or filed. David never threatened petitioner with physical harm or separation from her children if she refused to sign any income tax return. Sometime in 1982 or 1983 David told Margaret about starting Hitech. He told her that the business of the company was to be the extraction of oil from old oil wells. Hitech's Articles of Incorporation were filed with the California Secretary of State on February 18, 1983, and Margaret was designated as an officer and director. On March 25, 1985, Margaret signed as Secretary of Hitech on a document filed with the California Division of Oil & Gas. Hitech issued no stock certificates, kept no minutes of stockholders or directors meetings, maintained no business address, kept no books and records, and filed no income tax returns. David was at all times the controlling person, director and chief executive officer of Hitech. Sometime before or during 1985 David took Margaret to see an oil field purportedly operated by Hitech. David ran Hitech out of the Wiksells' residence but nobody came to the house to transact *106 business. During 1985 Margaret wrote checks on her personal checking account to pay for business supplies for David. From January 1984, through November 1984, Margaret received 23 Hitech checks totaling $ 54,500. From January 1985, through October 1985, Margaret received 15 Hitech checks totaling $ 140,500. Sometime before the spring of 1984 David went to work for Comstock Financial as a real estate investment adviser. From the spring of 1984 through the fall of 1985, David was employed by Comstock Financial as a corporate officer and Vice President of Investments. During the spring of 1984 David told Margaret that Comstock Financial was investing in Hitech. During 1984 and 1985 David and Margaret maintained an ongoing social relationship with Roy L. Comstock (Comstock), the President of Comstock Financial, and his wife, attended social gatherings with the Comstocks and other company employees, and attended company functions at restaurants, the Comstocks' home and the Comstock Financial business offices. Based on her attendance at the gatherings in the offices of Comstock Financial, Margaret concluded from the ambiance of the offices that Comstock Financial was doing very *107 well. During 1984 and 1985 Margaret knew that David had the use of a Comstock Financial credit card for business purposes. During 1984 and 1985 Margaret knew that David frequently used a Comstock Financial limousine to take Margaret, the Wiksell children, and business associates to social events. Sometime between the spring of 1984 and the fall of 1984 Margaret accompanied David on a trip to Hawaii that was financed by Comstock Financial for its officers as a reward for business they had done. During the years in issue, Margaret heard the term "managed investment account" but didn't know what it meant although she and David talked about it. Margaret saw Comstock Financial and Managed Investment Account brochures and observed that the brochures referred to David's 20 years of investment experience, a fact which Margaret knew was untrue. In October, 1985, David told Margaret that the Securities and Exchange Commission (SEC) had recently issued a temporary restraining order against Wiksell and others to prevent them from engaging in the solicitation of investment funds. At or about the time of this occurrence, Margaret knew that on November 5, 1985, David's deposition was taken *108 by the SEC, and David told her that his testimony involved things that had gone on at Comstock Financial. David moved his business furniture and belongings out of the Comstock offices and into the family room of the Wiksell residence in the fall of 1985. A newspaper article, including David's photograph, appeared in the Los Angeles Times on March 3, 1986, reporting in detail a scam perpetrated by Comstock, Abraham Boldt and David wherein the sum of at least $ 2 million, fraudulently obtained from unsuspecting investors of Comstock Financial, was diverted to Hitech, David's oil company. Margaret read the newspaper article on or about March 3, 1986, the date of its publication. In January or February, 1987, David was arrested by law enforcement authorities and charged with fraud in connection with the Comstock/Wiksell scam reported in the newspaper article. Margaret knew the details of these events prior to June of 1987 when she signed the 1984 return. There were many times during petitioners' marriage when they did not have enough money to pay their living expenses. During 1982 and 1983 petitioners were able to maintain a moderate standard of living only due to Margaret's working *109 long hours to pay the family's expenses. To Margaret's knowledge, during 1983 the Wiksell family's only substantial source of income was from her employment. In January, 1984, Margaret received the first Hitech check from David. The check was in the amount of $ 4,000. Margaret questioned David regarding the source of the check. David told her that the money came from investments. During 1984 and 1985 petitioners experienced no trouble in paying their living expenses. In 1984 Margaret wrote checks on her separate checking account to various charitable organizations totaling $ 10,580. In 1984 Margaret wrote three checks on her separate checking account totaling $ 2,750 as contributions to a political candidate running for Congress. Petitioners' 1984 Federal income tax return reported a total of $ 10,525 in gross income. Petitioners' 1985 Federal income tax return reported a total of $ 4,298 in gross income. The Wiksells' Federal income tax returns for 1984 and 1985 reported no wages or earnings attributable to David. In 1985 Margaret wrote checks on her separate checking account to various charitable organizations totaling $ 14,510. At the time she was making these donations *110 Margaret thought it was "odd, to say the least," that petitioners were donating such large sums of money to charity. David was imprisoned in county jail for 8 months, from January or February to September or October of 1987; he was then released on bail for 3 or 4 months, and after pleading guilty to the felonies charged, was imprisoned in State prison. Shortly after David's arrest in January or February of 1987, and while he was in county jail, Margaret gained access to his filing cabinets, desk and briefcases located in the family room of the Wiksell residence, and also located his business heckbook. Margaret observed envelopes from Security Pacific and Merrill Lynch addressed to Hitech which were delivered each month to her home. While David was in county jail, Margaret went to the office of the couples' accountant to pick up the 1984 joint income tax return, but had no discussion with the accountant relative to the contents of the return. In June, 1987, while David was incarcerated, Margaret took the 1984 Federal return to him to sign. At the time she signed the 1984 and 1985 returns, Margaret questioned David about why the returns contained no income reflecting the money *111 that he gave her. She suspected from past experience that David wasn't telling her the truth regarding why the returns reflected no income earned by him. She would not, in any event, have contradicted what he was telling her. During 1984 David received and retained $ 465,400 in illegally diverted funds from investors of Comstock Financial. During 1985 David received and retained $ 1,572,018 in illegally diverted funds from investors of Comstock Financial. Beginning at the end of 1983 and continuing throughout 1984 and 1985, a substantial portion of the illegal funds received by David from Comstock Financial investors were used to purchase various real properties and oil and gas rights. The aforementioned real properties, including a large tract of land known as Towsley Canyon, as well as various oil, gas, and mineral rights, were acquired in the names of David Wiksell and Margaret Wiksell. A one-sixth interest in a 111-acre parcel of Towsley Canyon was originally titled and at the time of trial was held in Margaret's name only. The Towsley Canyon property at the time of trial was in escrow for sale to the Santa Monica Mountains Conservancy. On November 11, 1983, Margaret *112 entered into an oil, gas, and mineral lease with regard to property acquired with the illegally transferred funds, by signing her name thereto, both in her individual capacity and as a representative of Hitech. In 1991 Margaret received $ 5,000 in royalty payments on account of oil, gas, and mineral lease rights acquired by her with the illegally diverted funds. Margaret signed the documents necessary to take title to the various properties of her own free will and without coercion or duress. Margaret did not question where the money came from to acquire the property in 1983. During 1984 and 1985 petitioners were members of a private country club. Margaret paid country club expenses totaling $ 4,003 in 1984 and $ 4,430 in 1985, with Hitech funds deposited into one of her separate checking accounts. During 1984 and 1985 petitioners and their children went to the country club for Sunday dinner approximately once a month. During 1984 and 1985 petitioners maintained two horses for pleasure. Margaret paid maintenance expenses for the horses, totaling $ 2,489 in 1984 and $ 3,960 in 1985, with Hitech funds deposited into one of her separate checking accounts. Petitioners and their *113 daughter Wendy each rode the horses. During 1984 Margaret purchased furniture costing $ 3,200 with Hitech funds deposited into one of her separate checking accounts. During 1985 she purchased furniture costing $ 3,605.18 and spent the sum of $ 15,145 substantially for home improvements with Hitech funds deposited into one of her separate checking accounts. David subjected petitioner to physical abuse on one occasion, and to intimidation and threats throughout their marriage. OPINION We first address respondent's Motion to Dismiss for Lack of Prosecution as to Petitioner David L. Wiksell (Motion) on the ground that he failed to proceed as provided by Rule 123. Although he was provided with more than ample notice of the pendency of the trial of this case, David declined to participate in pretrial preparation, and failed to appear in person or by counsel at the trial. Respondent's Motion, in detailed numbered paragraphs, sets out each step by which David was kept advised of actions required to be taken by him to participate in the preparation for trial, and of the date certain set by the Court for the commencement of the trial. The Motion recites that David failed to respond *114 to respondent's so-called Branerton letter (see Branerton Corp. v. Commissioner, 61 T.C. 691 (1974)) requesting that David attend an informal meeting to discuss stipulating facts; failed to respond to a written request by Margaret's counsel that David contact such counsel regarding respondent's Branerton letter; refused to serve upon respondent's counsel and the Court a trial memorandum as required by the Court's Standing Pre-Trial Order, although David had been served with respondent's trial memorandum; refused to respond to respondent's proposed stipulation of facts which was sent to David by respondent; and refused to notify respondent's counsel or the Court that he, David, intended to concede his case and not appear at the trial, although he had so advised Margaret's counsel of his intentions. On December 4, 1992, when respondent's proposed stipulation of facts was sent to David by respondent, David was also notified that the Court had set Monday, December 14, 1992, as the date certain for the commencement of the trial. Respondent's Motion was filed at the beginning of the trial on December 14, 1992. Since David did not attend the trial *115 he did not, of course, respond to the Motion. Rule 123(b) provides, among other things, that for failure of a petitioner properly to prosecute the Court may dismiss a case and enter a decision against the petitioner. We therefore hold that petitioner David L. Wiksell is liable for the income tax deficiencies determined in the notice of deficiency. Respondent bears the burden of proving that David is liable for the increased income tax deficiencies asserted by respondent in an Amended Answer, and for the addition to tax for fraud. Rule 142(b). On January 16, 1992, respondent filed as a matter of course under Rule 41 an Amended Answer containing a number of affirmative allegations, a responsive pleading not having been served by petitioners as of that date. On March 30, 1992, petitioners filed a Reply containing a general denial of the allegations contained in respondent's Amended Answer. Notwithstanding the general denial contained in petitioners' Reply, we deem David's intentional failure to participate in the trial of this case to constitute an admission of the truthfulness of respondent's affirmative allegations, and we so hold. In situations where respondent has the burden *116 of proof, and where a taxpayer fails to appear at trial, entry of decision against the taxpayer is justified without trial where the issues are well-pleaded. Smith v. Commissioner, 91 T.C. 1049 (1988), affd. 926 F.2d 1470 (6th Cir. 1991). The facts alleged in respondent's Amended Answer may be summarized as follows: On their 1984 and 1985 returns petitioners reported only Margaret's income from wages, plus partnership income of $ 524 and royalties of $ 200 in 1984. David was a principal participant in an investment scam through which he diverted substantial amounts to petitioners in 1984 and 1985. He also received income from oil sales and interest income in those years. The total of these amounts was as follows: 1984
Net income from Comstock
$   465,400
Income from oil sales
3,899
Total income
469,299
1985 Net income from Comstock/
Preferred
1,537,019
Income from oil sales
63,128
Interest income
6,944
Total income
1,607,091
Petitioners reported none of these amounts on their 1984 and 1985 returns. In 1987 David was tried, convicted, and imprisoned for a California securities law violation. See Cal. *117 Corp. Code sec. 25540 (West 1977). With respect to the addition to tax for fraud, respondent must establish by clear and convincing evidence that: (1) An underpayment exists for the year in issue; and (2) that some portion of the underpayment is due to fraud. Petzoldt v. Commissioner, 92 T.C. 661, 698-699 (1989); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983); Habersham-Bey v. Commissioner, 78 T.C. 304, 311 (1982). To meet this burden respondent must show that a taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Indicia of fraud include understated income, inadequate records, implausible or inconsistent explanations of behavior, concealment of assets, and failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Coninck v. Commissioner, 100 T.C. 495, 499 (1993). *118 The facts recited in respondent's Amended Answer, which David is deemed to have admitted by reason of his default, abundantly establish that David intentionally concealed and failed to report large amounts of income in both of the years in question. Respondent's allegations set forth facts sufficient to sustain a finding of fraud for each of the years in issue attributable to the entire underpayment as asserted by respondent in the Amended Answer, and we so hold. By reason of his default David is also liable for the increased deficiencies asserted by respondent in the Amended Answer for 1984 and 1985. We turn now to Margaret's innocent spouse claim. The relevant part of section 6013(e) provides: (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES. -- (1) In General. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and *119 (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. (2) Grossly Erroneous Items. -- For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse -- (A) any item of gross income attributable to such spouse which is omitted from gross income, and (B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law.
Thus, an "innocent spouse" is relieved of liability if such person establishes that, even though a joint return has been filed, the return contained a substantial understatement of tax attributable to grossly erroneous items attributable to the putatively culpable spouse (culpable spouse); the innocent spouse, in signing the return did not know, or have reason to know, that there was such substantial understatement; *120 and taking into account all the facts and circumstances, it would be inequitable to hold the innocent spouse liable for the deficiency attributable to the substantial understatement. Petitioners bear the burden of proving that each of the requirements of section 6013(e) has been satisfied, and failure to prove any one of the controverted statutory requirements will prevent Margaret from qualifying for relief. Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 432 (11th Cir. 1993). "Grossly erroneous items" are defined in section 6013(e)(2)(A) to include "any item of gross income attributable to * * * [the culpable] spouse which is omitted from gross income". Substantial understatement, for purposes of the innocent spouse provisions, "means any understatement * * * which exceeds $ 500." Section 6013(e)(3). Margaret and respondent have stipulated that David omitted from the 1984 and 1985 returns the income he diverted to himself from Comstock, as well as the income he received from the sale of oil and the interest income received from Merrill Lynch. It is undisputed that such omissions are grossly erroneous *121 items attributable to David and that they produced a substantial understatement in tax. Thus, these prerequisites for innocent spouse protection have been met. The parties' disagreement commences with whether petitioners have established that Margaret neither knew nor had reason to know of the substantial understatements, and whether it would be inequitable to hold her liable for the resultant deficiencies and additions thereto. A would-be innocent spouse has "reason to know" of a substantial understatement if a reasonably prudent taxpayer in the same position as the spouse at the time of signing the return could be expected to know that the return contained the substantial understatement. Guth v. Commissioner, 897 F.2d 441, 443-444 (9th Cir. 1990), affg. T.C. Memo. 1987-522. This rule is particularly applicable in cases such as the one before us involving understatements attributable to omissions of income and not deduction errors. See 897 F.2d at 444. We do not believe it necessary to repeat all of our findings of fact to demonstrate our reasons for concluding that Margaret not only had reason *122 to know, but actually had knowledge, that the returns contained substantial understatements. Her actual knowledge is established by the simple fact that Margaret admitted that she asked David why there was no income on the returns reflecting the money that had been coming to her through him from Hitech, and which the family had been living on during the years in issue. This admission effectively contradicts her other testimony that she didn't look at the returns before signing them. Margaret also had reason to know of the substantial understatements. She was well aware of David's involvement in Hitech, and during 1984 she received 23 Hitech checks from David totaling $ 54,500, which she deposited into her separate checking accounts. During 1985, she received 15 Hitech checks from David totaling $ 140,500 which she deposited into her separate checking accounts. Throughout these years Margaret wrote large checks on her individual account to charities, political candidates, and for home improvements. She had to know that her own meager earnings from nursing were vastly insufficient to provide these funds. In early 1987, Margaret gained access for the first time to David's "business *123 things". While David was in county jail in mid-1987, Margaret went to the office of the couple's accountant, picked up the 1984 return and took it to the jail to get David's signature. Margaret testified that she had no discussion with the accountant about the 1984 return. We think this is likely true, but we view this testimony in a different light than that in which petitioners would have us cast it. The threnody which sounds throughout petitioners' case is that Margaret was always too intimidated by David to act independently. Thus her position appears to be that she meekly went to the accountant's office, picked up the 1984 return without saying a word to him about it, and left. But knowing what she did about David's affairs after rummaging through his business papers so that, in her words, "I could find information and get things together to get him out [of jail]," she obviously had discovered quite a lot about the family's newfound sources of income before she went to the accountant's office. To have discussed any of this with the accountant would have invited a flood of questions which it is safe to assume Margaret would not have cared to answer. We also note that, *124 well before she signed either the 1984 or the 1985 return, Margaret had read a long newspaper article (featuring David's picture, among others) which detailed a scam in which David was alleged to have participated with Comstock and Abraham Boldt, and by which they bilked a number of individuals out of millions of dollars from their personal savings and other sources. While the details recited in the newspaper article are hearsay insofar as the truth of the matters contained therein is concerned, the article itself is admissable evidence that Margaret was on notice before she signed the 1984 and 1985 returns that she should make inquiry as to possible sources of income required to be reported. Margaret testified that David told her "that he had investments in Hitech that had been lost and this was * * * money being returned back * * * it just didn't make sense to me and, so, I just stopped questioning him." But ignorance of the tax consequences of the items which give rise to a deficiency is of itself an insufficient defense for one seeking innocent spouse relief. Purcell v. Commissioner, 826 F.2d 470, 474 (6th Cir. 1987), affg. 86 T.C. 228 (1986). *125 The Court of Appeals for the Ninth Circuit has stated that Factors to consider in analyzing whether the alleged innocent spouse had "reason to know" of the substantial understatement include: (1) the spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances. * * * [Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989), revg. T.C. Bench Op. Dkt. No. 15475-85; see 887 F.2d at 966 n.12.]
Applying these four factors, it is obvious that regardless of Margaret's level of education (she was admittedly not versed in financial matters), and the question of her involvement in the family's business and financial affairs, there were many expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending 'patterns, and David's evasiveness and deceit concerning the couple's *126 finances were manifest. We conclude that in signing the returns Margaret both knew and had reason to know that there was a substantial understatement of tax. Having reached the above conclusion, we need not unduly dwell on the question of whether it would be inequitable to hold Margaret liable for the deficiencies. Our findings of fact demonstrate that Margaret received substantial benefits from the omissions from income. We pointed out in Purcell v. Commissioner, supra, 86 T.C. at 241, that even though section 6013(e) does not expressly refer to specifically received benefits from the income omission, it would not be inequitable to hold the would-be innocent spouse liable for the deficiency if substantial benefits were received. Section 1.6013-5(b), Income Tax Regs., provides in relevant part: (b) Inequitable defined. Whether it is inequitable to hold a person liable for the deficiency in tax, within the meaning of paragraph (a)(4) of this section, is to be determined on the basis of all the facts and circumstances. In making such a determination a factor to be considered is whether the person seeking relief significantly benefitted, directly *127 or indirectly, from the items omitted from gross income. * * * Evidence of direct or indirect benefit may consist of transfers of property, * * *
During 1984 and 1985 David received and retained, through Hitech, a total of $ 2,037,418 in illegally diverted funds from investors of Comstock Financial. During each of these years a substantial portion of the illegal funds was used to purchase and make additional payments on various real properties and oil, gas, and mineral rights. These real properties, including a large tract of land known as Towsley Canyon, and various oil, gas, and mineral rights, were acquired in the names of David and Margaret Wiksell. A one-sixth interest in a 111-acre parcel of Towsley Canyon was originally titled and at the time of trial was held in Margaret Wiksell's name alone. In addition, beginning in late 1983 and continuing through 1984 and 1985, Margaret entered into oil, gas, and mineral leases with regard to property acquired with the illegally diverted funds. She executed the agreements in her individual capacity as well as a representative of Hitech. The record reflects that in 1984 Margaret received a royalty payment of $ 200 with regard *128 to one lease and in 1991 received $ 5,000 with regard to another lease. During 1984 Margaret accompanied David on a Hawaiian vacation financed by Comstock for its officers as a reward for business they had done. During 1984 and 1985 the Wiksells maintained a membership in a country club. Margaret and their children used the club on a monthly basis. During the same years the Wiksells maintained two pleasure horses which David, Margaret, and their daughter rode. These activities stand in sharp contrast to the life of penury endured by Margaret in the prior years of her marriage to David. Pathetic though that life undoubtedly was, it does not render it inequitable to hold her liable for the deficiencies in tax brought about by her signing returns that were manifestly incorrect insofar as the omissions from gross income are concerned, and by which Margaret munificently benefitted. Notwithstanding the question of Margaret's status as an innocent spouse under section 6013(e)(1)(B), (C), and (D), petitioners argue that Margaret's signatures on the two returns in question were obtained by duress, so that consequently the returns do not constitute true joint returns. Section 6013(e)(1)(A) *129 requires, of course, that to set the innocent spouse wheels in motion a joint return must have been made. Margaret's testimony recounts a woeful tale of David's systematic abuse of her and their children over 32 years of married life (the marriage terminated at about the time this case was tried). David and Margaret lived together this entire time, except when David was imprisoned or living in a halfway house. Until the years of his adventures with Hitech and Comstock, David never adequately supported his family, and the family life included a long history of bounced checks, evictions, and petty borrowings from other family members to keep the bill collector at bay. During this time David went in and out of marginal jobs and enterprises, and Margaret earned what money she could working part time as a registered nurse. At one time David dragged Margaret out of bed and threw her across the room and against the wall. One of the children, testifying about witnessing this incident, spoke of seeing her father holding her mother by the hair and slamming her head against the wall. Throughout the marriage David consistently intimidated Margaret and the children, and scoffed at, belittled, *130 and tormented Margaret especially, but also the children. Margaret's attempts to discuss money matters with David were almost always met with anger and responses such as "leave me alone, I'm working." Petitioners offered the testimony of Dr. Leonard W. Sushinsky to establish that Margaret is a victim of an abusive relationship with a power wielding spouse. At the time of trial Margaret was seeing Dr. Sushinsky occasionally and participating in a support group sponsored by the Association to Aid Victims of Domestic Violence. Dr. Sushinsky holds a Ph.D. degree in psychology from Northwestern University, and completed a postdoctoral internship while on the faculty of the University of Illinois in Chicago. At the time of trial he had worked on the staff of Kaiser Permanente as a clinical psychologist for 13 years. He first saw Margaret as a patient in May, 1992 (more than four years after the tax returns in question were signed and filed). He had seen her professionally approximately 10 times by the time of trial on December 14, 1992. Dr. Sushinsky had never previously testified in Court and appeared only because Margaret is his patient. For his appearance in court he expected *131 to be paid only his regular hourly salary and expenses. Dr. Sushinsky defined the abusive relationship in which Margaret found herself as "a relationship in which one party punishes or in some way physically or non-physically intimidates the other member of the relationship to the point where the second person will say and do almost anything in order to continue to survive in the relationship." Dr. Sushinsky testified: THE COURT: Are there degrees of power wielding in cases that you see? I mean, some are worse -- some are more -- THE WITNESS: Oh, sure. * * * Sometimes a wife won't go along with some things but will go along with many other things. Sure. THE COURT: And what about this case? THE WITNESS: Well, this case it seems to me [is] like one where the relationship developed slowly over the years until she was pretty much into the role, and the role was to say very little and just go along, question once in a while until he starts yelling, hear the same old threats, and then let go and just go along until I really would suspect she didn't think much, she just wanted to get through the day.
Beyond the foregoing colloquy Dr. Sushinsky was not directly confronted with *132 the question whether, in his opinion, his diagnosis of spousal abuse was the psychic equivalent of overt threats in the context of Margaret's return signings. But on the record before us, we would not in any event be able to accept the validity of an affirmative answer to the question. We have held that a spouse's liability on a joint return depends upon such person's voluntary execution of the return. Stanley v. Commissioner, 45 T.C. 555, 560 (1966). We recognize that the United States Court of Appeals has stated that "Duress" may exist not only when a gun is held to one's head while a signature is being subscribed to a document. A long continued course of mental intimidation can be equally as effective, and perhaps more so, in constituting duress. * * * [Furnish v. Commissioner, 262 F.2d 727, 733 (9th Cir. 1958), affg. in part and remanding in part Funk v. Commissioner, 29 T.C. 279 (1957); fn. ref. omitted.]
However, it has also been held that the applicable standard for determining duress is entirely subjective, i.e., "whether the pressure applied did in fact so far affect *133 the individual concerned as to deprive such person of contractual volition". Brown v. Commissioner, 51 T.C. 116, 119 (1968). The standard as developed involves two critical elements: (1) Whether the taxpayer was unable to resist demands to sign the tax return; and (2) whether the taxpayer would not have signed the returns except for the constraint applied to his or her will. Brown v. Commissioner, 51 T.C. at 119; Stanley v. Commissioner, 45 T.C. 555, 562 (1966). A United States District Court decision (which analyzes duress in tax return cases in impressive detail) holds that "a taxpayer's showing of a generalized fear toward her domineering spouse is insufficient; the taxpayer must produce specific evidence that he or she was indeed overcome by duress at the precise time when the tax return was signed, and that absent such duress, the taxpayer would not have signed the return." United States v. Kramer, 83-2 USTC par. 9474, at 87,705, 52 AFTR 83-5630, at 83-5634 (D. Md. 1983), affd. by court order (4th Cir., June 26, 1983). We found Dr. Sushinsky's *134 testimony to be straightforward and convincing, as far as it goes. Nevertheless, neither the facts nor Dr. Sushinsky's testimony satisfy the test for establishing duress. Petitioners bear the burden of proving duress. Rule 142. Margaret signed the 1984 return at or about the time she took it to the jail for David's signature. The record contains no further details of this event, and is entirely silent as to the circumstances surrounding the signing of the 1985 return later in 1987. The closest Dr. Sushinsky's testimony comes to dealing with duress in these two specific circumstances is that Margaret, in any confrontational circumstance, might be expected to "just go along". But this is a far cry from establishing that in each of these two instances she feared that some harm to herself was imminent. Petitioners' case in this posture stands in stark contrast with that, for example, in Brown v. Commissioner, 51 T.C. at 120. There, the taxpayer was partially paralyzed, in pain, and in bed, yet her domineering spouse threatened to hit her if she did not sign the return. We are simply not convinced that Margaret would not have signed the two returns *135 only because of demands by David. As we have already discussed she was aware of the substantial funds available to the couple in the years in question, she knew they were not mentioned on the returns, and she, David, and their children had substantially benefitted from the funds. None of this points to an involuntary signing by Margaret. In short, petitioners have failed to establish a nexus between spousal abuse generally and duress in specific instances, the specific instances in this case being Margaret's signing of these two tax returns. For the foregoing reasons we hold that Margaret is not an innocent spouse as defined in section 6013(e). An appropriate Order of Dismissal and Decision will be entered as to petitioner David L. Wiksell. Decision will be entered under Rule 155 as to petitioner Margaret Wiksell.